Nos. 23-2828 & 23-2831

---

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

DAZMINE ERVING,
Defendant-Appellant.

---

Appeal from the United States District Court
for the Central District of Illinois
Case Nos. 22-cr-10033 & 20-cr-10012
The Honorable Judge James E. Shadid

---

BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, DAZMINE ERVING

---

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main Street
Urbana, Illinois 61801
Telephone:   217-373-0666
Fax:            217-373-0667
Email: Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
DAZMINE ERVING

---

**ORAL ARGUMENT REQUESTED**

---

## Circuit Rule 26.1 Disclosure Statement

Appellate Court No: 23-2828 & 23-2831
Short Caption: United States v. Erving

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case:

**Dazmine Erving**

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Federal Public Defender's Office for the Central District of Illinois**

(3)     If the party or amicus is a corporation: N/A
   i)     Identify all its parent corporations, if any; and

**N/A**

   ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

**N/A**

(4)     Provide the information required by FRAP 26.1(b) - Organizational Victims in Criminal Cases:

**N/A**

(5)     Provide Debtor information required by FRAP 26.1(c)1 & 2:

**N/A**

Attorney's Signature: **/s/ Michael Will Roy**          Date: **November 30, 2023**
Attorney's Printed Name:  Michael Will Roy

Please indicate if you are *Counsel of Record* for the          ☒  **Yes**
above listed parties under Circuit Rule 3(d).          ☐  No

Address:   Federal Public Defender          Phone Number:   (217) 373-0666
   300 West Main Street          Fax Number:   (217) 373-0667
   Urbana, Illinois 61801          Email:          Michael_Roy@fd.org

# Table of Contents

**Page**

Circuit Rule 26.1 Disclosure Statement ..................................................................... ii

Table of Authorities................................................................................................... v

Introduction............................................................................................................... 1

Jurisdictional Statement ........................................................................................... 3

Issues Presented for Review ..................................................................................... 4

Statement of the Case ............................................................................................... 5

   I.   Factual background ................................................................................ 5

   II.   Procedural background...................................................................... 12

     A.   Suppression hearing .......................................................... 12

     B.   Sentencing Hearing ...........................................................15

Summary of Argument ........................................................................................... 18

Argument ................................................................................................................ 20

   I.   The district court should have suppressed the evidence from the
     warrantless search of Erving's car. ................................................... 20

     A.   Standard of review............................................................. 20

     B.   The protective-search exception from *Michigan v. Long* did
       not justify the search.......................................................... 21

       1.   Legal standard .......................................................... 21

       2.   The search in this case fails under both prongs of *Long*. . 23

       3.   Alternatively, the *Long* exception is irrelevant because
         Barisch did not perform a protective search. ................. 28

     C.   The automobile exception did not justify the search. ................31

       1.   Legal standard .................................................................31

2.      The smell of cannabis does not create probable cause unless combined with other factors. .............................. 35

3.      Application ..................................................... 39

4.      The elephant in the room: Possession of cannabis remains illegal under federal law...................................... 43

D.      Conclusion ............................................................... 45

II.     The district court procedurally erred during Erving's sentencing by relying on speculation and a constitutionally prohibited factor in aggravation. ...................................................................... 46

A.      Standard of review................................................... 46

B.      The district court engaged in improper speculation about Erving's prior sentencing hearing............................... 46

C.      The district court improperly punished Erving for having children. ............................................................... 48

Conclusion.......................................................................................51

Certificate of compliance with Fed. R. App. P. 32(a)(7)(B) ............................. 52

# Table of Authorities

**Page**

## Cases

*Arizona v. Gant*, 556 U.S. 332 (2009)........................................................................... passim

*Arkansas v. Sanders*, 442 U.S. 753 (1979) ........................................................... 33

*Brinegar v. United States*, 338 U.S. 160 (1949) ................................................... 33

*Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir.2000) .................................... 48

*Byrd v. United States*, 138 S. Ct. 1518 (2018) ..................................................... 32

*California v. Acevedo*, 500 U.S. 565 (1991)........................................................... 32

*California v. Carney*, 471 U.S. 386 (1985)............................................................. 32

*Cardwell v. Lewis*, 417 U.S. 583 (1974) ................................................................ 33

*Carroll v. United States*, 267 U.S. 132 (1925) ................................................. 31, 33

*Chambers v. Maroney*, 399 U.S. 42 (1970) .......................................................... 33

*Collins v. Virginia*, 138 S. Ct. 1663 (2018) ......................................................1, 32

*Colorado v. Bannister*, 449 U.S. 1 (1980) ............................................................ 33

*Commonwealth v. Barr*, 266 A.3d 25 (Pa. 2021) ................................................. 38

*Commonwealth v. Craan*, 13 N.E.3d 569 (Mass. 2014)....................................... 38

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ............................................... 33

*Florida v. Harris*, 568 U.S. 237 (2013).................................................................. 32

*Florida v. Meyers*, 466 U.S. 380 (1984) ............................................................... 33

*Florida v. White*, 526 U.S. 559 (1999)................................................................... 32

*Gutierrez v. Schomig*, 233 F.3d 490 (7th Cir. 2000) ............................................ 45

*Husty v. United States*, 282 U.S. 694 (1931) ........................................................ 33

*In re D.D.*, 277 A.3d 949 (Md. 2022) ..................................................................... 38

*Johnson v. United States*, 333 U.S. 10 (1948) ........................................ 35

*Lange v. California*, 141 S. Ct. 2011 (2021) ........................................ 34

*Lewis v. State*, 233 A.3d 86 (Md. 2020) ........................................ 38

*Maryland v. Dyson*, 527 U.S. 465 (1999) ........................................ 1, 32

*Matter of T. T.*, 479 P.3d 598 (Or. Ct. App. 2021) ........................................ 37

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ........................................ 48, 49

*Michigan v. Long*, 463 U.S. 1032 (1983) ........................................ passim

*Michigan v. Thomas*, 458 U.S. 259 (1982) ........................................ 33

*New York v. Class*, 475 U.S. 106 (1986) ........................................ 34

*Pennsylvania v. Labron*, 518 U.S. 938 (1996) ........................................ 32

*People v. Armstrong*, No. 360693, --N.W.2d--, 2022 WL 17169566
    (Mich. Ct. App. Nov. 22, 2022) ........................................ 37, 40

*People v. Hall*, 271 Cal. Rptr. 3d 793 (Cal. Ct. App. 2020) ........................................ 39

*People v. Hill*, 2020 IL 124595 ........................................ 38

*People v. McKnight*, 2019 CO 36 ........................................ 37

*People v. Molina*, 2022 IL App (4th) 220152 ........................................ 36, 37

*People v. Redmond*, 2022 IL App (3d) 210524 ........................................ 36, 37

*People v. Stribling*, 2022 IL App (3d) 210098 ........................................ 36, 37

*People v. Zuniga*, 2016 CO 52 ........................................ 38

*Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2019) ........................................ 37

*Robbins v. California*, 453 U.S. 420 (1981) ........................................ 33

*Scher v. United States*, 305 U.S. 251 (1938) ........................................ 33

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................ 20

*Sherouse v. Ratchner*, 573 F.3d 1055 (10th Cir.2009) ........................................ 37

*Shields v. Burge*, 874 F.2d 1201 (7th Cir. 1989) .................................................. 32

*Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535 (1942) .......................... 49

*State v. Ortega*, 770 N.W.2d 145 (Minn. 2009) .................................................... 38

*Texas v. Brown*, 460 U.S. 730 (1983) .................................................................... 33

*Texas v. White*, 423 U.S. 67 (1975) ....................................................................... 33

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................................. 48

*United States v. Arnold*, 388 F.3d 237 (7th Cir. 2004) .......................................... 27

*United States v. Barahona-Montenegro*, 565 F.3d 980 (6th Cir. 2009) ................. 49

*United States v. Basinski*, 226 F.3d 829 (7th Cir. 2000) ........................................ 20

*United States v. Baskin*, 401 F.3d 788 (7th Cir.2005) ........................................... 21

*United States v. Bohman*, 683 F.3d 861 (7th Cir. 2012) ..................................21, 26

*United States v. Bradley*, 628 F.3d 394 (7th Cir. 2010) ........................................ 47

*United States v. Buncich*, 20 F.4th 1167 (7th Cir. 2021) ....................................... 45

*United States v. Burrows*, 905 F.3d 1061 (7th Cir. 2018) ...................................... 46

*United States v. Cherry*, 436 F.3d 769 (7th Cir. 2006) .......................................... 40

*United States v. Coates*, No. 22-1924, 2023 WL 2523501 (7th Cir. Mar. 15, 2023) .......... 42

*United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005) ................................. 48

*United States v. Davis*, 44 F.4th 685 (7th Cir. 2022) ............................................. 20

*United States v. DeLeon*, 979 F.2d 761 (9th Cir. 1992) ......................................... 41

*United States v. Di Re*, 332 U.S. 581 (1948) .......................................................... 33

*United States v. Donald*, 84 F.4th 59 (1st Cir. 2023) ............................................ 21

*United States v. Donelli*, 747 F.3d 936 (7th Cir. 2014) .......................................... 48

*United States v. Evans*, 994 F.2d 317 (7th Cir. 1993) .......................................23, 24

*United States v. Eymann*, 962 F.3d 273 (7th Cir. 2020) ........................................ 40

*United States v. Flores*, 929 F.3d 443 (7th Cir. 2019) ........................................ 44

*United States v. Franklin*, 547 F.3d 726 (7th Cir. 2008) .................................. 40

*United States v. Halliday*, 672 F.3d 462 (7th Cir. 2012) .................................. 47

*United States v. Helding*, 948 F.3d 864 (7th Cir. 2020) .................................. 46

*United States v. Hollingsworth*, 495 F.3d 795 (7th Cir. 2007) ........................... 48

*United States v. Johns*, 469 U.S. 478 (1985) ........................................ 32, 35

*United States v. Kaba*, 480 F.3d 152 (2d Cir. 2007) .................................. 50

*United States v. Kizart*, 967 F.3d 693 (7th Cir. 2020) .................................. 40

*United States v. Lee*, 950 F.3d 439 (7th Cir. 2020) .................................. 48

*United States v. Leo*, 792 F.3d 742 (7th Cir. 2015) .................................. 27

*United States v. Lickers*, 928 F.3d 609 (7th Cir. 2019) .................................. 40

*United States v. Malik*, 963 F.3d 1014 (9th Cir. 2020) .................................. 38

*United States v. Manyfield*, 961 F.3d 993 (7th Cir. 2020) .................................. 48

*United States v. Mazzone*, 782 F.2d 757 (7th Cir. 1986) .................................. 40

*United States v. Mosby*, 541 F.3d 764 (7th Cir. 2008) .................................. 40

*United States v. Nelson*, 774 F.3d 1104 (7th Cir. 2014) .................................. 47

*United States v. Newton*, 76 F.4th 662 (7th Cir. 2023) .................................. 47, 48

*United States v. Norville*, 43 F.4th 680 (7th Cir. 2022) .................................. 20

*United States v. Oliver*, 873 F.3d 601 (7th Cir. 2017) .................................. 46

*United States v. Olson*, 41 F.4th 792 (7th Cir. 2022) .................................. 21, 25

*United States v. Paige*, 870 F.3d 693 (7th Cir. 2017) .................................. 22, 40

*United States v. Paniagua-Garcia*, 813 F.3d 1013 (7th Cir. 2016) .................................. 21, 41

*United States v. Pennington*, 908 F.3d 234 (7th Cir. 2018) .................................. 46

*United States v. Pointer*, No. 22-1082, 2022 WL 17820539
    (6th Cir. Dec. 20, 2022) ................................................................ 38

*United States v. Rodgers*, 924 F.2d 219 (11th Cir. 1991) ............................ 29, 30

*United States v. Ross*, 456 U.S. 798 (1982) ............................................ 31, 32, 33

*United States v. Shaw*, 39 F.4th 450 (7th Cir. 2022) ................................ 46

*United States v. Terry*, 915 F.3d 1141 (7th Cir. 2019) ............................ 20, 27

*United States v. Trujillo-Castillon*, 692 F.3d 575 (7th Cir. 2012) ...................... 49

*United States v. Tucker*, 404 U.S. 443 (1972) ........................................ 46

*United States v. Vaccaro*, 915 F.3d 431 (7th Cir. 2019) ............................ passim

*United States v. Vasquez*, No. 19-50275, 2021 WL 3011997
    (9th Cir. July 15, 2021) ................................................................ 39

*United States v. Williams*, 887 F.3d 326 (7th Cir. 2018) ............................ 47

*United States v. Wimbush*, 337 F.3d 947 (7th Cir.2003) ............................ 40

*United States v. Yarbrough*, 961 F.3d 1157 (11th Cir. 2020) ...................... 29

*Warlick v. Cross*, 969 F.2d 303 (7th Cir. 1992) ...................................... 42

*Welsh v. Wisconsin*, 466 U.S. 740 (1984) .......................................... 32, 33, 34

*Wyoming v. Houghton*, 526 U.S. 295 (1999) ........................................ 32

*Zullo v. State*, 2019 VT 1 (2019) .................................................... 38

## Statutes

18 U.S.C. § 922(g) ................................................................ 3, 11, 12

18 U.S.C. § 3231 ................................................................ 3

18 U.S.C. § 3583 ................................................................ 3

18 U.S.C. § 3742 ................................................................ 3

21 U.S.C. §§ 801-971 ................................................................................ 44

28 U.S.C. § 1291 ......................................................................................... 3

410 ILCS 705/1-7 ...................................................................................... 39

410 ILCS 705/1-10 .................................................................................... 41

410 ILCS 705/10-15(b) .............................................................................. 42

410 ILCS 705/10-35(a) ........................................................................ 42, 43

625 ILCS 5/11-502.15 ............................................................................... 41

625 ILCS 5/11-506 .................................................................................... 26

720 ILCS 5/11-1.60(d) ................................................................................. 9

720 ILCS 550/4 ......................................................................................... 43

## Other Authorities

Chicago Street Race Festival Map, NASCAR Chicago Street Race Weekend ................ 26

Cynthia A. Sherwood et. al., *Even Dogs Can't Smell the Difference,*
   *The Death of 'Plain Smell,' As Hemp Is Legalized*, 55 Tenn. B.J. 14 (2019) ............. 35, 41

Emily Corwin, *Smoking Hemp Catches On*, NPR (Sept. 7, 2019) ...................................... 41

Fed. R. App. P. 4(b)(1)(A)(i) ........................................................................... 3

FED. R. CRIM. P. 51(a) ................................................................................. 46

U.S. Const. amend IV ....................................................................... passim

U.S. Const. amend. XIV ............................................................................. 48

White House Briefing Room, Statement from President Biden
   on Marijuana Reform (Oct. 6, 2022) ............................................................. 45

**Introduction**

Courts have long recognized that persons have a lessened expectation of privacy in their cars as compared to their homes or persons. Sometimes, application of this principle is simple. For example, if an officer has "abundant probable cause" that a car is being used to transport cocaine, the officer may search that car without a warrant regardless of a lack of exigent circumstances. *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999). In other instances, however, law enforcement will stretch this principle and conduct a search that runs afoul of the Fourth Amendment. For example, probable cause will not allow a warrantless search of an automobile if it is parked in a partially closed driveway. *Collins v. Virginia*, 138 S. Ct. 1663, 1668 (2018). Nor may police use a search for weapons incident to arrest as an excuse to search sections of a car outside the "reaching distance" of the arrestee. *Arizona v. Gant*, 556 U.S. 332, 351 (2009).

This case falls into the latter category of abusive searches that violate even the diminished expectation of privacy attached to an automobile. It involves the archetypical example of a couple in the backseat of a car on lover's lane. Dazmine Erving was putting the moves on his date when a police officer pulled up and shined a light on his vehicle. Unsurprisingly, the couple scrambled to compose themselves as the officer approached. The officer then used these "furtive movements" as justification to search the car for weapons.

No reasonable officer could have interpreted the couple's movements as an attempt to hide a weapon. From the location of the couple, to the bodycam video showing

them in a state of semi-undress, every aspect of the scene made the scenario obvious. Erving was trying to have sex, and he "furtively" moved to make himself decent before the officer opened his car door. That is not a basis for suspecting dangerous weapons inside a car. Indeed, contrary to the officer's purported justification for the search, the bodycam video shows that the officer did not perform anything approximating a protective sweep. He simply fished for evidence.

The government's alternative justification for the search was even weaker. The officer said he smelled cannabis, which the government argued gave him probable cause to search the car under the "automobile exception." Five or ten years ago, the government would have been correct that the smell of cannabis created probable cause for a search. But not in the current era of legalized recreational cannabis. This case involves a municipal police officer, in a state in which cannabis is legal. The officer conceded during a suppression hearing that he saw no evidence that the couple had used cannabis illegally under state law. And the government waived any reliance on federal laws outlawing cannabis. Nothing about the alleged smell created probable cause to suspect a crime.

This Court should reverse the district court's ruling denying Erving's motion to suppress and vacate Erving's conviction for the gun found in the car. Separate from that issue, the district court further erred at sentencing when it (1) relied on speculation; and (2) impermissibly punished Erving for fathering a child. So, even if this Court does not reverse the suppression ruling, it should still remand for resentencing.

## Jurisdictional Statement[1]

The United States District Court for the Central District of Illinois had jurisdiction under 18 U.S.C. §§ 3231 and 3583. In Case No. 20-cr-10012, Dazmine Erving was previously convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (R. 20.) The judgment included a 3-year term of supervised release. (R. 20 at 3.) The district court revoked that term and imposed a 24-month prison sentence, with no further supervised release to follow. (App. at 46.)

In Case No. 22-cr-10033, a grand jury sitting in the Central District of Illinois indicted Erving for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (R. 10.) Erving pleaded guilty (R. 21), and the district court sentenced him to 41 months' imprisonment and three years' supervised release (App. at 40).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. In both cases, the district court imposed sentence on September 6, 2023. (Sept. 6, 2023, minute entry.) The district court entered a final judgment in a criminal case in Case No. 22-cr-10033 on September 7, 2023 (R. 26), and a revocation judgment in Case No. 20-cr-10012 on September 8, 2023 (R. 41). Erving filed timely notices of appeal from both judgments on September 21, 2023. (Case No. 20-cr-10012, R. 44; Case No. 22-cr-10033, R. 30; Fed. R. App. P. 4(b)(1)(A)(i).)

---

[1] The following abbreviations are used herein: record on appeal: "R.___ at ___;" appendix: "App. at ___;" suppression hearing transcript: "Supp. Tr. at ___;" and Government's Suppression Ex. D, Barisch's body-cam video: "Video at ___."

## Issues Presented for Review

I.  Did the district court err when it denied Dazmine Erving's motion to suppress when:

      a)  It ruled that police had reasonable suspicion to support a protective search of Erving's car, even though (1) the officer's suspicion was based on movements consistent with Erving getting dressed, (2) the officer moved Erving out of reaching distance of the car prior to the search, and (3) the officer's actions were objectively inconsistent with a protective search; and

      b)  The government's only alternative justification for the search was that the smell of cannabis created probable cause under state law, even though cannabis is legal in Illinois and the officer testified that he had no reason to suspect that Erving used cannabis illegally?

II.  Did the district court procedurally err at sentencing when:

      a)  The court refused to consider Erving's mitigation arguments because it speculated that Erving might have raised the same arguments during a previous sentencing, even though the court admitted that it did not actually check the record from that previous sentencing; and

      b)  The court chastised Erving for having fathered a child, despite Erving's constitutional right to bear and raise children?

## Statement of the Case

### I.     Factual background

The facts come from the transcript of the suppression hearing (R. 19), and police body-camera video of the search and arrest (Supp. Tr. at 17; R. 19, Govt Ex. D). Unless otherwise specified, citations to the record are in Case No. 22-cr-10033.

At around 2:45 a.m., on a September night, local Police Lieutenant Erin Barisch drove into the River Front Park in Peoria, Illinois. (Supp. Tr. at 13.) The park was closed. (Supp. Tr. at 13.) But Barisch saw an SUV parked at the far end of the parking lot. (Supp. Tr. at 14.) This was not unusual; during his 17 years of experience patrolling the area, Barisch had learned that the park was a popular spot for couples to hook up. (Supp. Tr. at 36.) And indeed, that night Dazmine Erving was in the backseat of the car with a woman. (Supp. Tr. at 20–21.)

Barisch stopped to investigate. (Supp. Tr. at 15.) The area where Erving had parked the car was "very dark," and no lights were on inside the car. (Supp. Tr. at 14–15.) Barisch shined lights on the car. (Supp. Tr. at 17–18.) He later testified that he could see some movement inside:

> As I—as I exited and had my light shining in there with my flashlight approaching, both occupants were, were kind of making sudden movements, but I could observe the individual—the male behind the driver's seat make a quick, sudden movement leaning down and then toward the rear of the back driver's seat toward the floorboard, and then he quickly sat back up.

(Supp. Tr. at 21.) Because the rear windows of the car were tinted, however, Barisch admitted that he could not see "[s]pecifics" inside the car—only the occupants' general

movements. (Supp. Tr. at 44–45.) Here is what the car looked like from Barisch's point of view:



GOVERNMENT
EXHIBIT

B2

22-CR-10033

(R. 16-3.)

When Barisch reached the vehicle, either he or Erving opened the car door. (Video at 0:22–0:25.) When the door opened, Erving was only half dressed. (Supp. Tr. at 24; Video at 00:18–1:05.) He appeared to have quickly pulled on his pants, but not had time to grab any other clothes.



(Video at 00:40.)

When Erving reached forward to get his identification from the front seat, it became clear that Erving had not even had time to completely pull on his pants:



(Video at 01:01.)

In the video, Barisch can be heard laughing at the sight of Erving's buttocks. (Video at 00:55.) Barisch would later testify that he knew as soon as he arrived that the couple had been attempting to have sex. (Supp. Tr. at 34–35.) Couples having sex was a

"common thing" in this location, and "[w]hen I approached the vehicle, the way that they were in the backseat, I, you know, I—that's what I suspected of occurring." (Supp. Tr. at 36.)

Barisch would later claim that he also smelled a "lingering odor" of cannabis from the car. (Supp. Tr. at 23.) But the car did not have any smoke in it. (Supp. Tr. at 23.) Nor did Erving seem intoxicated to Barisch. (Supp. Tr. at 42.) Barisch did not ask the couple about the smell, or otherwise mention cannabis while questioning them. (Supp. Tr. at 35.) Barisch later explained that "it wasn't a concern if they were under the influence" because he saw no evidence anyone was driving. (Supp. Tr. at 40.) They were in the backseat, and "[t]he car was parked. It wasn't driving. The impairment of, of the occupants at that time was—I didn't find necessary. Nobody was operating the vehicle." (Supp. Tr. at 40–41.)

Barisch asked the couple for identification. (Supp. Tr. at 26.) Erving gave Barisch his Illinois ID card, but Erving's companion said that she left her identification at home and gave a fake name. (Supp. Tr. at 26, 28.) The woman told Barisch that she was 19 years old but gave a date of birth that would have made her 17. (Supp. Tr. at 26–27.) (Illinois's age of consent is 17, so the woman's age was not by itself notable. 720 ILCS 5/11-1.60(d).) Barisch then shut the car door and walked back to his patrol vehicle to look up the couple's information. (Supp. Tr. at 27; Video at 2:00–2:15.)

Barisch left the couple alone for more than two minutes while he searched for information on his computer. (Video at 2:00–4:10.) As Barisch navigated the police database, he listened to sports radio. (Video at 2:18–3:51.)

Barisch discovered that Erving was on federal supervised release. (Supp. Tr. at 28.) No record showed up for the woman's name. (Supp. Tr. at 28.) Barisch returned to Erving's car and asked Erving about his status. (Supp. Tr. at 29.) Erving confirmed that he was under supervision for a weapon-possession charge and gave the name of his probation officer. (Video at 4:18–4:30, 5:15–5:21; Supp. Tr. at 29.) Erving denied having any weapons in the car. (Video at 4:28–4:31.)

Barisch told the couple to get out of the car. (Supp. Tr. at 29.) Erving asked for permission to get his shoes from the front seat, and Barisch agreed. (Supp. Tr. at 29–30.) Barisch then stood around while Erving opened the driver's door, grabbed his shoes, and rummaged around for other clothing. (Video at 4:54–5:20.) After gathering his items, Erving walked away from the car and started to get dressed. (Video at 5:20–5:30.) Barisch did not pat down Erving, nor did Barisch search any of the items that Erving removed from the car. (Video at 5:20–5:40.)

Meanwhile, Erving's companion had moved to the front passenger seat while Barisch had been looking up the couple's information. (Video at 4:55–4:57.) She too had rummaged around the car to grab more articles of clothing and was now more fully dressed. (Video at 5:30–5:37.) She also took her purse out of the car. (Supp. Tr. at 39; Video at 5:30–5:37.) Barisch asked the couple to stand away from the car doors in front of

10

the hood. (Supp. Tr. at 30; Video at 5:32–5:37.) As with Erving, Barisch did not pat down the woman or search the clothes that she grabbed from the car. (Video at 5:30–5:37.) Nor did Barisch check her purse. (Video at 5:30-5:37.)

After sending the couple away, Barisch walked up to the car and looked under the driver's seat. (Video at 5:40–5:50.) He later testified that he saw a handgun. (Supp. Tr. at 31.) Barisch explained that he searched this spot because of Erving's "furtive movement" when he approached the car, and he wanted to see if Erving hid something there. (Supp. Tr. at 44.) Barisch did not search any other part of the car at this time. (Video at 5:40–5:50.) Nor did he remove the gun. (Video at 5:40–5:50.)

Barisch walked back to his patrol car and faced away from the couple while he called for backup. (Supp. Tr. at 31; Video at 5:50–6:20.) Barisch then walked back and forth between the couple and his patrol car as he tried to get more information about the woman's identity. (Video at 6:20–8:00.) Barisch did not keep a close eye on the couple, facing away from them for significant periods of time. (E.g., Video at 7:20–7:55.) Later, when backup arrived, Barisch handcuffed Erving. (Supp. Tr. at 32; Video at 8:05–8:35.)

Erving was placed in the back of a squad car, after which Barisch read Erving his *Miranda* rights and asked Erving about the gun. (Video at 15:10–16:04.) Erving explained that he did not face any specific threats or have any plans for the gun, he just wanted it for protection because of a recent uptick in local street violence. (Video at 16:10–17:02.) Erving was arrested for aggravated unlawful use of a weapon by a felon, a state-law analogue to 18 U.S.C. § 922(g)(1). (Video at 19:10–19:30.) After that, Barisch retrieved

11

the gun from the car. (Video at 21:10–22:07.) No cannabis or cannabis paraphernalia was found in the car, even after a more thorough search. (Supp. Tr. at 35.)

Erving's companion eventually gave her real name to the police, who discovered that she had an outstanding warrant. (Video at 18:12–19:06, 26:20–26:30.) Barisch left her with a subordinate to sort out the situation. (Video at 39:05–39:50.)

## II.   Procedural background

A grand jury indicted Erving with unlawful possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). (R. 10.) Because Erving was on supervised release, this new charge also formed the basis of a petition for revocation. (Case No. 20-cr-10012, R. 34.)

### A.   Suppression hearing

Erving moved to suppress the gun as fruit of an illegal warrantless search. (R. 15.) In response, the government asserted that the search fell within two exceptions to the warrant requirement.

First, the government contended that the search was a protective sweep, under *Michigan v. Long*, 463 U.S. 1032 (1983), because Erving's criminal history and "furtive movements" provided reasonable suspicion that Erving was dangerous and had weapons in the car. (R. 16 at 6–11.)

Second, the government contended that the search was permissible under the "automobile exception" because the odor of cannabis gave Barisch probable cause to believe that Erving had contraband in the car. (R. 16. at 13–17.) The government

12

acknowledged that cannabis is legal in Illinois. (R. 16 at 13.) But it asserted that Barish had probable cause to believe that Erving used cannabis in a way that was still illegal under state law. (R. 16 at 14–17.)

The district court held a suppression hearing, during which Barisch testified. (R. 33). Barisch claimed that the movement he saw in the car seemed more consistent with Erving hiding something than with him putting pants on. (Supp. Tr. at 37.) But defense counsel pointed out that Barisch had conceded in his police report that it was hard to see because the windows were tinted. (Supp. Tr. at 52–53.) And although Barisch said he had "a heightened suspicion" from Erving's movements, he admitted that he had not been concerned that Erving was dangerous. (Supp. Tr. at 45–46.) Erving "was cooperative; he was polite; he wasn't aggressive; and he was answering my questions." (Supp. Tr. at 46.)

Barisch also admitted that the only evidence of illegal activity he saw when he first spoke to Erving (other than the cannabis smell) was that the couple may have been having sex in a car in a closed area. (Supp. Tr. at 42–43.) The defense then submitted a copy of the park ordinance showing that, in general, violations of park rules such as having sex or smoking cannabis in the park resulted in a municipal citation, rather than criminal penalties. (R. 19, Def. Ex. A, § 14.00.) Barisch also testified that being in the park after hours might be a park citation or city ordinance violation, but it would not have been an arrestable offense. (Supp. Tr. at 41.)

13

The district court asked the parties how the legal status of cannabis under federal law affected the probable-cause analysis. (Supp. Tr. at 54.) Both sides asked the court to focus on Illinois law. Erving argued that Barisch is an Illinois police officer who was imposing only state law. (Supp. Tr. at 55.) And the government said that the legal status of cannabis was "not something that the parties had briefed from that vantage point," and so it was not prepared to make that argument. (Supp. Tr. at 64–65.) Regardless, the government argued, Erving may have still violated various state laws, such as rules against smoking in the park. (Supp. Tr. at 64.) The government asked the court to follow pre-legalization precedent holding that cannabis odor created probable cause, while "understanding that it's a fluid and changing situation." (Supp. Tr. at 65.)

The district court denied the motion to suppress. (App. at 1.) The court avoided ruling on the automobile exception, concluding that the legalization of cannabis in Illinois rendered ambiguous whether cannabis odor alone could still create probable cause. (App. at 4–6.) Rather than resolve "this foggy issue," the court held that the search was a reasonable protective sweep under *Long*. (App. at 6.) It ruled that Barisch could reasonably suspect that Erving was armed and dangerous because of Erving's prior weapons conviction and the furtive movements that Erving made when Barisch approached. (App. at 6–10.) The search was reasonable, the court continued, because Barisch "had no other basis to arrest Erving" and thus could check the car for weapons before writing a citation and letting Erving return to the vehicle. (App. at 10.) Nonetheless, the court noted that the case was "a close call." (App. at 11.)

14

Erving then entered a conditional plea of guilty and admitted to violating his

supervised release, while reserving his right to appeal the suppression ruling. (R. 21;

R. 34.)

**B.    Sentencing Hearing**

At sentencing, the parties agreed that Erving was subject to guidelines ranges of 33

to 41 months' imprisonment for the new charge, and 21 to 24 months' imprisonment for

the revocation of supervised release. (App. at 14.) The government asked for within-

guidelines sentences in both cases, to be served consecutively. (App. at 17.) It argued that

Erving had multiple prior felonies, including repeat convictions for unlawful possession of

a firearm, with a pattern of being caught with guns only shortly after release from prison.

(App. at 15–21.)

Erving asked for 30 months' imprisonment for his new charge, to be served

concurrent with the revocation. (App. at 24.) The defense argued that Erving's criminal

history was exaggerated because some prior convictions, such as a schoolyard fight that

got charged as a "mob action," had been over-prosecuted. (App. at 22–24.) Then-

pending amendments to the Sentencing Guidelines, the defense pointed out, would also

have lowered Erving's criminal-history score if he were sentenced after the amendments

went into effect. (App. at 11.)

Defense counsel also argued that Erving's fear of street violence—his explanation

to Barisch for possessing the gun—was very real. (App. at 24–25.) Erving was an ex-gang

member, who left his gang in 2010. (App. at 24.) Although most Peorians would not feel a

15

need to arm themselves for protection, Erving faced inherent risk for rejecting his gang. (App. at 25.) Erving echoed this argument in his allocution. (App. at 29–32.) He said that he tried to escape the streets, but it had been "coming after me my whole life." (App. at 29.) Erving accepted responsibility for the offense and understood that he needed to go to prison for possessing the gun. (App. at 30.) But he wanted to clarify that he did not intend to harm anyone with the weapon. (App. at 31–32.) Rather, he had seen a recent increase in street violence in Peoria, and he did not know how else to protect himself. (App. at 31– 32.)

The court imposed a sentence of 41 months' imprisonment and three years' supervised release for the new offense, plus a consecutive 24 months' imprisonment for the revocation. (App. at 35, 40–49.) The court recognized that the pending amendments to the guidelines would slightly lower Erving's criminal-history score, but it otherwise rejected Erving's argument that his criminal history was overstated. (App. at 32–33.) The judge explained that although "I haven't reviewed the transcript of the previous sentencing," the same arguments about Erving's criminal history were "probably made by defense counsel at that time." (App. at 33.) "I'm not sure that we can continue to make those arguments if people continue to commit the same crimes." (App. at 33.)

The court credited Erving's explanation that he wanted the gun only for protection, and it recognized that Erving could not easily move away from potential violence. (App. at 33–34.) The judge conceded that "I don't know what to tell you. I don't have any answers for you." (App. at 34.) But if Erving continued to carry a gun, the

court continued, he may someday need to use it, and he would continue to find himself in court. (App. at 34–35.) The court concluded by saying that Erving's children would have to grow up without a father, but "maybe that's better for them." (App. at 37.) It further chastised Erving for "the last child that you made … made probably while you were in a halfway house," citing the newly "made" child as another "poor decision[]" in a series of "poor decisions." (App. at 37–38.)

Erving timely appealed. (Case No. 20-cr-10012, R. 44; Case No. 22-cr-10033, R. 30.)

## Summary of Argument

The district court erred when it denied Erving's motion to suppress. Contrary to the court's ruling, *Michigan v. Long,* 463 U.S. 1032 (1983), does not apply for three reasons. First, Barisch lacked reasonable suspicion that Erving was dangerous and could have weapons in the car. When police approach a couple hooking up in the backseat of a car, the couple's "furtive movements" are not evidence of dangerousness—they are evidence of the couple scrambling to compose themselves. Second, Barisch removed the couple from the car before he searched it, so there was no danger that the couple could gain immediate control of any weapons in the car. And third, even if Barisch could have been justified in conducting a protective sweep, he did not perform one. Because his objective actions were inconsistent with a search for safety reasons, the search was not a protective sweep, and *Long* does not apply.

The government's alternative justification, that cannabis smell created separate probable cause for a search, also fails. The "automobile exception" requires probable cause that a car contains evidence of a crime. Not evidence of a civil infraction or municipal violation. A crime. Cannabis is legal in Illinois. The government waived reliance on federal law. Without additional factors to suggest that Erving committed a crime while possessing cannabis, this justification goes nowhere.

Finally, the district court procedurally erred at sentencing. Erving had a due process right to be sentenced based on accurate information, and the court violated that right when it—admittedly—relied on speculation as part of its reasoning. The court also

crossed a line when it cited Erving's new child as an aggravating factor. Erving has a constitutional right to father children, and the court could not punish him for exercising it.

This Court should reverse the suppression ruling and vacate Erving's conviction in Case No. 22-cr-10033. (Erving does not dispute that the district court had grounds to revoke his supervision in Case No 20-cr-10012.) And regardless of whether this Court affirms or vacates the conviction in Case No. 22-cr-10033, this Court should still vacate Erving's sentence in both cases and remand for resentencing.

## Argument

### I.   The district court should have suppressed the evidence from the warrantless search of Erving's car.

Warrantless searches are *per se* unreasonable under the Fourth Amendment unless they fit within one of the warrant requirement's "few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009); *United States v. Terry*, 915 F.3d 1141, 1144 (7th Cir. 2019). Evidence derived from a warrantless search that does not fit within an established exception must be suppressed. *Terry*, 915 F.3d at 1146 (7th Cir. 2019).

The government has the burden to show that an exception applies. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). For the reasons below, it cannot meet its burden under either (1) the protective search exception from *Michigan v. Long,* 463 U.S. 1032; or (2) the "automobile exception" based on the smell of cannabis.

#### A.   Standard of review

This Court reviews the denial of a motion to suppress under a mixed standard: Legal conclusions are reviewed *de novo*, and most factual findings are reviewed for clear error. *United States v. Davis*, 44 F.4th 685, 688 (7th Cir. 2022). For events portrayed on video, however, this Court views the "facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (discussing video evidence at summary judgment). *See also United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) (applying same rule to suppression hearing). This Court gives no deference to findings that contradict the video, as a finding contradicted by video evidence is by its nature clearly erroneous. *See, e.g.,*

*United States v. Donald*, 84 F.4th 59, 68–69 (1st Cir. 2023) (rejecting district court's findings at suppression hearing).

**B.    The protective-search exception from *Michigan v. Long* did not justify the search.**

### 1.    Legal standard

A search under *Long* has two requirements: (1) the officer must have reasonable suspicion that an individual is "dangerous"; and (2) the officer must reasonably believe that the search is necessary because the individual might "gain immediate control of weapons" inside the vehicle. *Gant*, 556 U.S. at 346–47 (quoting *Long*, 463 U.S. at 1049).

For the first prong of the *Long* inquiry, reasonable suspicion is determined by the totality of the circumstances. *See United States v. Olson*, 41 F.4th 792, 800 (7th Cir. 2022). The suspiciousness of a suspect's actions depends on "context." *United States v. Bohman*, 683 F.3d 861, 865 (7th Cir. 2012) (quoting *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir.2005)). And a suspect's actions that are only possibly consistent with illegal activity, while also consistent with legal activity, will not create reasonable suspicion. For example, under an Indiana law that outlaws texting but no other cell phone use while driving, a driver's visible use of a phone does not create reasonable suspicion for a traffic stop. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016). An officer requires additional information to suspect the driver of illegal activity (texting) over more plausible legal inferences (map use, web surfing, etc.). *Id.* at 1013–14.

The second prong of *Long* requires reason to believe that the suspect could have gained "immediate control" of weapons in the vehicle. *Long*, 463 U.S. at 1050–51. Police

cannot search a car for suspected weapons if there is no danger of those hypothetical weapons being used. *"Long* searches are grounded in concern for officer safety, so if that concern is not present, *Long* does not justify the search." *United States v. Vaccaro*, 915 F.3d 431, 436 (7th Cir. 2019) (citing *Long*, 463 U.S. at 1050, and *Gant*, 556 U.S. at 338–39).

In *Arizona v. Gant*, 556 U.S. 332*,* the Supreme Court clarified what it means to be in "immediate control" of possible weapons. *Gant* dealt with a different Fourth Amendment exception for an automobile search incident to arrest, which allows an officer to search the area of a car from which an arrestee might gain possession of a weapon or destructible evidence of the offense of arrest. *Id.* at 339. Although not identical to the *Long* exception, the two exceptions are closely related. *See United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017) (comparing the two exceptions). And an automobile search for weapons incident to arrest has the same "immediate control" requirement as a protective sweep for weapons under *Long*. *Id.* at 335.

Prior to *Gant*, many courts had understood a search incident to arrest to allow police to search a car even when there was no possibility that the arrestee could gain access to the vehicle. *Id.* at 341. That was wrong, said the *Gant* Court. "Immediate control," the Court explained, means that police may search a car incident to arrest "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 343.

The same logic applies to *Long* searches. Because *Long* searches are grounded in concern for officer safety, *see Long*, 463 U.S. at 1050, the exception applies only when there is a danger that the suspect could gain immediate control of weapons in the car. That is, when the car's occupants are "within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 343.

### 2.    The search in this case fails under both prongs of *Long*.

Barisch lacked reasonable suspicion that Erving had weapons in the car. And even if Barisch had reason to suspect weapons, Erving was no longer in "reaching distance" of the passenger compartment at the time of the search, and thus no longer posed any danger.

**For the first prong:** Barisch cited Erving's "furtive movements" as justification to suspect that Erving had hidden a weapon below the driver's seat. In particular, Barisch testified that he saw Erving "make a quick, sudden leaning forward in a downward motion toward that area [in front of him] and then quickly return back up to the seated position." (Supp. Tr. at 22.) But Barisch conceded that he could not see any "[s]pecifics" because of the car's tinted windows. (Supp. Tr. at 44–45, 52–53.) And when the car door opened, Barisch found that Erving was half-dressed, wearing only pants. (Video at 00:40.) The only reasonable inference is that the furtive movements Barisch saw earlier was Erving struggling to get dressed and compose himself as Barisch approached.

This case is not like *United States v. Evans*, 994 F.2d 317 (7th Cir. 1993), or *Vaccaro*, 915 F.3d 431, the cases that the government relied on in the district court. In

*Evans*, officers testified that when they attempted to pull over the defendant, he leaned forward for several seconds as if hiding or retrieving something under the seat. *Id.* at 321. But unlike Erving, the suspect in *Evans* made that motion while driving. *Id.* And more importantly, the officers saw the suspect stop at a duplex that the police were currently investigating as an alleged "drug house," *id.* at 319, which contributed to the reasonableness of the suspicion. *Id.* at 321. Erving's car, in contrast, was found parked in a known hook-up spot.

In *Vaccaro*, the primary justification for the search was again the suspect's "furtive movements" of bending forward at the waist to possibly conceal a weapon. *Vaccaro*, 915 F.3d at 436. But the movement in *Vaccaro* was more extreme than here, involving multiple "ferocious" moves to try to reach other seats in the car while officers approached. *Id.* at 434. And unlike Erving—who was sober, polite, and compliant with Barisch's directions (Supp. Tr. at 42)—the suspect in *Vaccaro* was in a "real amped-up state," and seemed to be intoxicated in a way that gave officers "greater reason to fear for their safety." *Vaccaro*, 915 F.3d at 434, 436–37. Yet, despite the additional indicia of dangerousness in *Vaccaro*, this Court still considered it a "close[] call" whether *Long* justified a protective search. *Id.* at 434.

More importantly, this case has a factor absent from both *Evans* and *Vaccaro*: overwhelming evidence of an innocent explanation for the "furtive movements." Without context, Barisch's description of Erving reaching down to his feet and quickly sitting back up sounds similar to *Vaccaro*. (Supp. Tr. at 22.) But reasonable suspicion is

determined by the totality of the circumstances. *Olson*, 41 F.4th at 800. And the relevant

context here is that Barisch found Erving haphazardly half-dressed with a date—not even

appearing to have had time to put on underwear under his not-fully pulled-on jeans.



(Video at 01:01.)

As Barisch later testified, he could tell the couple was trying to have sex. (Supp.

Tr. at 34–35.) This kind of backseat hookup in the park was a "common thing" that

Barisch had seen repeatedly during his 17 years of policing the area. (Supp. Tr. at 36.) And Barisch can even be heard laughing in the video at the sight of Erving's buttocks. (Video at 00:55.) As soon as Barisch found Erving in this state, he knew what was going on, and any suspicion that arose from Erving's earlier movements dissipated.

An officer cannot ignore evidence of an innocent explanation for a defendant's actions. Take, for example, an officer who sees multiple cars speed recklessly through downtown Chicago. Alone, this observation could create probable cause that the drivers of the vehicles are violating Illinois's criminal statute against street racing. *See* 625 ILCS 5/11-506. But if the officer also knows that a NASCAR race is scheduled in Grant Park that weekend, and he sees that the racing cars are covered in sponsors' logos and sticking to barricaded roadways, then any suspicion dissipates. *See* Chicago Street Race Festival Map, NASCAR Chicago Street Race Weekend, https://www.nascarchicago.com/course-layout/ (last visited November 30, 2023). Exculpatory facts must be considered when deciding what is a reasonable inference. Context matters. *See Bohman*, 683 F.3d at 865.

**For the second prong:** By the time Barisch searched the car, he had already removed the couple and placed them away from the vehicle. (Video at 5:32–5:37.) They were not within "reaching distance" of the passenger compartment, *Gant*, 556 U.S. at 351, nor could they "gain immediate control of weapons" inside the car, *Long*, 463 U.S. at 1049. Thus, regardless of any basis Barisch may have had to reasonably suspect weapons, he was no longer justified in searching the vehicle. *See United States v. Leo*, 792 F.3d 742,

26

750 (7th Cir. 2015) (*Long* exception did not apply in part because defendant could not get immediate control of searched backpack).

The defense recognizes that this Court's decision in *Vaccaro* hurts Erving's argument. In *Vacarro*, this Court held that the second prong of *Long* is always satisfied when police investigate a nonjailable offense because, without an arrest, a suspect will always be able to regain access to the car after receiving a citation. *Vaccaro*, 915 F.3d at 437. The district court relied on this reasoning to hold that the government satisfied *Long*'s second prong. (App. at 10.) But *Vaccaro* was wrongly decided. To the extent that resolution of this case hinges on *Long*'s second prong, this Court should consider overruling *Vaccaro*'s holding on how to apply prong two.

In *Vaccaro*, this Court relied on pre-*Gant* precedent holding that an officer may always search a car before impounding it for a nonjailable traffic violation because otherwise the motorist might "gather items from the car before leaving the scene." *United States v. Arnold*, 388 F.3d 237, 241 (7th Cir. 2004). That precedent became dubious after *Gant* tightened the "immediate access" prong, clarifying that a suspect must be within "reaching distance" of any potential weapons in the passenger compartment to justify a search. *Gant,* 556 U.S. at 343. But the *Vaccaro* Court concluded that *Gant* did not abrogate *Arnold* because "*Arnold* applies to *Terry* stops; *Gant* applies to arrests." *Vaccaro*, 915 F.3d at 437. Only when a suspect is arrested, the *Vaccaro* court reasoned, does the government need to consider whether the suspect has immediate control over the passenger compartment. *Id.*

27

The problem with *Vaccaro*'s reasoning is that it nullifies *Long*'s second prong. According to *Vaccaro*, prong two is always satisfied when a suspect does not face arrest. But a suspect will *never* be arrested in a *Long* case, because a pre-search arrest transforms the search into one incident to arrest under *Gant*. Thus, under *Vaccaro*'s reasoning, this Court will never see a case in which the second prong of *Long* is in dispute. Prong two of *Long* is satisfied *because* the case is a *Long* case. That reasoning is circular. It also suggests that a suspect who commits a less serious, and therefore nonjailable, offense has less expectation of privacy in his car than one who commits a more grievous crime.

In any event, this Court need not decide whether to reconsider *Vaccaro* because the *Long* exception already fails under prong one. And even if the government could satisfy both prongs, Barisch's actions fell outside the exception as explained in the next section.

### 3. Alternatively, the *Long* exception is irrelevant because Barisch did not perform a protective search.

Ultimately, the protective-search exception is a red herring. Even if the government could satisfy the two-prong test of *Long,* the video shows that Barisch was not concerned about his safety and did not perform a protective sweep or search Erving's car for safety reasons. The *Long* exception applies only when officer safety is a concern. *Vaccaro*, 915 F.3d at 436. And although the thrust of the Fourth Amendment is objective (rather than a subjective analysis of the officer's actual beliefs at the time), this Court may look at an officer's actions to determine whether they are objectively consistent with a protective search for safety reasons. *United States v. Yarbrough*, 961 F.3d 1157, 1166 (11th

28

Cir. 2020). If an officer does not act like he is conducting a protective sweep, then exceptions that rely on officer protection as a justification do not apply. *Id.* (citing *United States v. Rodgers*, 924 F.2d 219, 222 (11th Cir. 1991)).

The bodycam video shows that after Barish got Erving's identification information—and after Barish had already observed the "furtive movements" that supposedly gave Barisch reason to fear for his safety—Barish simply shut the car door and walked away. (Video at 2:00.) Barisch then left Erving alone while he returned to the patrol car. (Video at 2:00–4:02.) He listened to sports radio while he looked up Erving's information. (Video at 2:18–3:51.) An ESPN announcer opined that the Tampa Bay Buccaneers could win the Super Bowl because of Tom Brady's decision to play in the 2022 NFL season. (Video at 2:18–3:15.) And the announcer declared that the Seattle Seahawks won their opening game after the Denver Broncos missed a game-winning field goal. (Video at 3:24–3:51.) Barish, meanwhile, did not take any steps to secure Erving's car or search for weapons before he left the couple alone. On the contrary, if Erving had desired to grab a weapon or other contraband, Barisch gave Erving ample opportunity to do so.

Even after Barisch learned that Erving was on supervised release for a prior "weapon" conviction, Barish still showed no concern that Erving was *currently* armed. He asked Erving and Erving's date to get out of the car, but he did not pat them down or otherwise search their persons. (Video at 4:45–4:54.) Instead, Barish gave Erving permission to open the front driver's side door and rummage around for his shoes. (Video

29

at 4:52–5:15.) He then allowed Erving and Erving's companion to grab other clothes out of the car and get dressed—again, without patting them down or checking whether a weapon was hidden within those clothes. (Video at 5:10–5:40.) Barish even allowed the woman to take *her purse* out of the car without asking to check the bag for contraband. (5:34–5:37.) No reasonable viewer could conclude from the video that Barisch's actions were consistent with an officer who thought that the couple had secreted weapons.

As for the search itself, Barisch beelined to the driver's seat to look under it. (Video at 5:40–5:50.) After he saw the gun, he stopped the search. (Id.) He did not remove the weapon to prevent Erving from grabbing it. He did not sweep the rest of the car to look for additional weapons. And he did not arrest or restrain Erving to stop him from going back to the car to grab the gun. Instead, Barisch walked back to his patrol car and faced away from the couple while he called for backup. (Supp. Tr. at 31; Video at 5:50–6:20.) For the next couple minutes, while Barish waited for backup, he walked back and forth between the couple and his patrol car as he tried to get more information about the woman's identity. (Video at 6:20–7:40.) He faced away from the couple for an extended amount of time. (Video at 7:20–7:55.) If Barisch was concerned that Erving could access the gun, he did nothing to prevent Erving from getting it.

From an objective standpoint, Barisch's actions were inconsistent with a protective search. And when an officer does not act as though he is conducting a protective search, the government cannot later rely on that exception to justify the warrantless intrusion. *See Rodgers*, 924 F.2d at 222 (seizure of a weapon was not a

protective sweep because officer merely entered the home, seized guns, and stepped outside without making "any inspection of the rest of the premises"). Because officer safety was not a concern when Barisch looked under the driver's seat, the *Long* exception does not apply. *See Vaccaro*, 915 F.3d at 436.

The district court erred when it found that Barish had grounds for a protective sweep under *Long*. But in any case, even if Barish did have grounds to search for weapons, the video shows that he simply did not perform a protective search. Barish was fishing for contraband, in a way that is unreasonable under the Fourth Amendment.

### C.    The automobile exception did not justify the search.

#### 1.    Legal standard

First recognized in *Carroll v. United States*, 267 U.S. 132 (1925), and clarified in *United States v. Ross*, 456 U.S. 798 (1982), the "automobile exception" allows police to search a vehicle without a warrant if there is probable cause to believe it contains evidence of criminal activity. *Gant*, 556 U.S. at 347.

Two key points about the automobile exception are worth highlighting.

First, police cannot automatically search an entire car whenever they have probable cause to believe a crime occurred. The exception applies only when the police have probable cause to believe that the automobile itself *contains* contraband or evidence of a crime, and the search must be limited to particularized areas where that evidence might be found. *Ross*, 456 U.S. at 824–25. "[T]he scope of the warrantless search authorized by th[e automobile] exception is no broader and no narrower than a magistrate

could legitimately authorize by warrant." *Id.* at 825. For example, probable cause to believe a vehicle contains undocumented immigrants will not justify a search of a suitcase inside the vehicle that is too small for the suspected immigrants to hide within. *Id.* at 824.

Second, any evidence sought by an officer must be evidence of a *crime*, not merely evidence of a civil infraction or municipal violation. *See Shields v. Burge*, 874 F.2d 1201, 1207 (7th Cir. 1989) (explaining that automobile exception applies only to "search[es] for criminal evidence" and not noncriminal investigations). The limitation to *criminal* contraband makes sense because the government's interest in enforcing civil infractions is significantly lessened when compared to investigating criminal activity. *Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984). Accordingly, the Supreme Court has never applied the automobile exception in a case involving a civil infraction—only in cases in which police sought evidence of a felony or misdemeanor.

| Cases applying automobile exception | Items being searched for |
|---|---|
| *Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018) | Stolen motorcycle |
| *Byrd v. United States*, 138 S. Ct. 1518, 1525, 1530 (2018) | Marijuana in a jurisdiction where possession was criminal (2014 Pennsylvania) |
| *Fla. v. Harris*, 568 U.S. 237, 240 (2013) | Drugs, after alert from dog trained to detect various criminal substances |
| *Maryland v. Dyson*, 527 U.S. 465, 465 (1999) | Distribution quantities of cocaine |
| *Fla. v. White*, 526 U.S. 559, 561 (1999) | Car used to transport cocaine |
| *Wyoming v. Houghton*, 526 U.S. 295, 298–99 (1999) | Narcotics, after suspect admitted hypodermic syringe was for drugs |
| *Pennsylvania v. Labron*, 518 U.S. 938, 939 (1996) | Cocaine |
| *California v. Acevedo*, 500 U.S. 565, 567 (1991) | Large quantity of marijuana, in jurisdiction where such quantity was criminal. (1987 California) |
| *California v. Carney*, 471 U.S. 386, 388 (1985) | Motor home being used to distribute marijuana |
| *United States v. Johns*, 469 U.S. 478, 480 (1985) | Internationally trafficked marijuana (federal investigation) |

| *Fla. v. Meyers*, 466 U.S. 380 (1984) | Evidence of sexual battery |
|---|---|
| *Texas v. Brown*, 460 U.S. 730, 733–34 (1983) | Heroin and/or other narcotics |
| *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) | Marijuana in a jurisdiction where possession was criminal (1981 or earlier Michigan) |
| *United States v. Ross*, 456 U.S. 798, 800 (1982) | Criminal narcotics (later tested as heroin) |
| *Robbins v. California*, 453 U.S. 420, 422 (1981) | Marijuana in a jurisdiction where possession was criminal Jan 5, 1975 California) |
| *Colorado v. Bannister*, 449 U.S. 1, 3–4 (1980) | Stolen goods |
| *Arkansas v. Sanders*, 442 U.S. 753, 761 (1979) | Marijuana in a jurisdiction where possession was criminal (1976 Arkansas) |
| *Texas v. White*, 423 U.S. 67, 67 (1975) | Fraudulent checks, in midst of attempt to cash |
| *Cardwell v. Lewis*, 417 U.S. 583, 587 (1974) | Tread pattern on tires, to compare against tracks at murder scene |
| *Coolidge v. New Hampshire*, 403 U.S. 443, 458–62 (1971) | Evidence in murder investigation |
| *Chambers v. Maroney*, 399 U.S. 42, 47 (1970) | Proceeds of robbery |
| *Brinegar v. United States*, 338 U.S. 160, 162 (1949) | Evidence of criminal liquor smuggling |
| *United States v. Di Re*, 332 U.S. 581, 585 (1948) | Counterfeit gasoline ration coupons, which could lead to felony charges at the time |
| *Scher v. United States*, 305 U.S. 251, 255 (1938) | Evidence of criminal liquor smuggling |
| *Husty v. United States*, 282 U.S. 694, 701 (1931) | Prohibition-era liquor |
| *Carroll v. United States*, 267 U.S. 132, 160 (1925) | Prohibition-era liquor |

The Supreme Court has also recognized a significant distinction between civil infractions and criminal offenses. In *Welsh v. Wisconsin*, state officers entered a defendant's home while investigating his driving under the influence. 466 U.S. at 742–43. If the defendant's DUI had been a serious criminal offense, exigent circumstances may have allowed the officers to enter the home before the defendant sobered up. *Id.* at 752–53. But because Wisconsin had chosen to classify first-offense DUIs as a civil infraction, the Court held that officers could not reasonably enter the home without a warrant. *Id.* at 754. The State's classification of the offense as noncriminal was "the best indication of

the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest." *Id. See also Lange v. California*, 141 S. Ct. 2011, 2019–20 (2021) (differentiating between pursuit of fleeing felons versus fleeing misdemeanants, and concluding that the latter involves too minor an offense to justify warrantless home entry).

Similarly, in *New York v. Class*, 475 U.S. 106 (1986), the Court upheld an officer's decision to reach into a car during a traffic stop to move papers obscuring the vehicle identification number. This intrusion, the Court held, was a reasonable search supported by probable cause that the driver violated traffic laws. *Id.* at 117–18. But the Court emphasized that probable cause for a traffic violation would not have allowed the officer to rummage freely throughout the passenger compartment; only a limited intrusion to reveal the concealed vehicle identification number was permissible, and only because the number was not already visible from outside the car. *Id.* at 119.

In short: the Supreme Court recognizes a difference between criminal and civil infractions. And because the Supreme Court has thus far limited the automobile exception only to searches for evidence of criminal—and not civil—infractions, this Court should be wary of expanding the exception beyond that bright line. Even with the lessened expectation of privacy that applies to an automobile, exceptions to the warrant requirement remain "few" and "well-delineated." *Gant*, 556 U.S. at 338. And to counsel's knowledge, this Court has not thus far expanded the automobile exception to evidence of civil infractions.

34

The two limitations outlined above explain why the government did not attempt to justify the search based on Erving's violations of park rules (*e.g.*, hanging out in the park after closing, engaging in possible sexual activity within the park). Violations of those rules was not a crime, only a municipal citation. (R. 19, Def. Ex. A, § 14.00.) And even if they were a crime, nothing inside the car could have provided evidence of the violations beyond what Barisch already observed. The automobile-exception analysis in this case is limited to the smell of cannabis.

### 2. The smell of cannabis does not create probable cause unless combined with other factors.

In general, an odor can provide probable cause only if detected by someone "qualified to know the odor, and [if the odor is] one sufficiently distinctive to identify a forbidden substance." *Johnson v. United States*, 333 U.S. 10, 13 (1948). Historically, the "distinct odor of marihuana" was sufficient under this standard to provide probable cause under certain circumstances. *United States v. Johns*, 469 U.S. 478, 482 (1985). But much has changed in recent years with the legalization of recreational cannabis in many states, and with the federal legalization of CBD and hemp products, which smell identical to formerly illegal cannabis. *See* Cynthia A. Sherwood et. al., *Even Dogs Can't Smell the Difference, The Death of 'Plain Smell,' As Hemp Is Legalized*, 55 Tenn. B.J. 14, 15 (2019). Now, the growing consensus in recreational-cannabis jurisdictions is that the odor of marijuana alone can no longer support probable cause for a search.

For example, after Illinois legalized cannabis, that state's court of appeals held in *People v. Stribling*, 2022 IL App (3d) 210098, ¶ 28, that the smell of burnt cannabis alone no longer provided probable cause for a search during a traffic stop. The *Stribling* court explained that it was legal for individuals to possess cannabis, and to even smoke it before driving if their blood concentration was below the legal threshold. *Id.* "Moreover, the smell of burnt cannabis may have lingered in the defendant's car or on his clothing. Simply put, there was no evidence that would lead a reasonable officer to conclude that there was a substantial chance of criminal activity afoot." *Id.*

The Illinois Court of Appeals held again that the smell of burnt marijuana did not provide probable cause to search a car in *People v. Redmond*, 2022 IL App (3d) 210524. When police in that case pulled over the defendant for speeding, an officer smelled a "strong odor" of burnt cannabis, but the defendant denied smoking in the vehicle and did not show any signs of impairment. *Id.* ¶¶ 3–5. Nonetheless, the officer searched the car based on the smell. *Id.* ¶ 9. Because no corroborating factors beyond the odor supported probable cause, the court again ruled that the search was unconstitutional. *Id.* ¶ 22–26.

True, a different district of Illinois's appellate court reached the opposite conclusion in *People v. Molina*, 2022 IL App (4th) 220152, but that court's reasoning was flawed. Although the *Molina* court recognized that the defendant could legally possess cannabis, it reasoned that cannabis smell could still create probable cause because state law still described illegal ways to store, transport, or consume the plant. *Id.* ¶¶ 40–43. An officer who smells cannabis on a vehicle, the *Molina* court explained, does not need to rule

out innocent explanations before suspecting that the suspect is violating cannabis-storage or -transportation laws. *Id.* ¶ 46–48. The *Molina* court's reasoning, however, impermissibly allows police to speculate about illegal activity based on evidence (cannabis odor) that is equally consistent with legal possession. As this Court has explained: "Where an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes more than speculation or mere possibility to give rise to probable cause." *Rainsberger v. Benner*, 913 F.3d 640, 649 (7th Cir. 2019) (quoting *Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir.2009)). The *Molina* court's decision does not withstand scrutiny under this principle.

The Illinois Supreme Court has granted leave to appeal in both *Molina* and *Redmond* to resolve the split in the Illinois court of appeals. *People v. Molina*, 210 N.E.3d 799 (Ill. 2023) (Table); *People v. Redmond*, 210 N.E.3d 786 (Ill. 2023) (Table). Those cases remain pending in that court. Meanwhile, decisions from around the country confirm that the *Molina* court is wrong, while the *Stribling* and *Redmond* courts are correct that cannabis odor alone cannot create probable cause.

In other states that have legalized cannabis, courts consistently hold that the "smell of marijuana in a car in which an adult is present is no longer remarkable" and no longer on its own creates suspicion of criminal activity. *Matter of T. T.*, 479 P.3d 598, 611 (Or. Ct. App. 2021).[2] Likewise, in jurisdictions where cannabis remains illegal but small

---

[2] *See also People v. Armstrong*, No. 360693, --N.W.2d--, 2022 WL 17169566, at *5 (Mich. Ct. App. Nov. 22, 2022) ("smell of marijuana, by itself, does not give rise to probable cause"); *People v. McKnight*, 2019 CO 36, ¶ 36 (alert from dog trained to detect drugs including marijuana is, at most, "suggestive of criminality, but not determinative on

amounts are decriminalized, courts have held that "the odor of marijuana, without more" does not create probable cause to believe a suspect possesses *criminal* quantities. *Lewis v. State*, 233 A.3d 86, 91 (Md. 2020).[3]

On the other hand, when courts have relied on the smell of cannabis to uphold automobile searches in recreational-cannabis jurisdictions, they have done so because other factors *in addition to the smell* created probable cause. *See, e.g., In re D.D.*, 277 A.3d 949, 971–73 (Md. 2022) (cannabis smell on juveniles, *plus* evasive behavior, prior discovery of weapon on one of them, baggy clothing, and concern that group of teens was trespassing created reasonable suspicion for frisk); *People v. Zuniga*, 2016 CO 52, ¶¶ 23, 26–29 ("heavy odor" of cannabis, *plus* dog's alert to unknown narcotic, the driver and passenger's "extreme" nervousness, and their conflicting answers to police questions created probable cause).[4]

Thus, when reviewing cases from recreational-cannabis jurisdictions, a simple rule emerges: Cannabis odor can *contribute* to probable cause if combined with other factors,

---

its own"); *Commonwealth v. Barr*, 266 A.3d 25, 43–44 (Pa. 2021) (in state where medical but not recreational cannabis is legal, no probable cause to search vehicle during traffic stop based solely on smell of marijuana); *Zullo v. State*, 2019 VT 1, ¶ 79 (2019) (odor alone did not create probable cause to seize and search vehicle).

[3] *See also Commonwealth v. Craan*, 13 N.E.3d 569, 574 (Mass. 2014) (post-decriminalization, odor of marijuana alone cannot support probable cause to search automobile); *State v. Ortega*, 770 N.W.2d 145, 149 n.2 (Minn. 2009) (odor of burnt marijuana does not create probable cause to believe person possesses a criminal amount).

[4] *See also United States v. Pointer*, No. 22-1082, 2022 WL 17820539, at *9 (6th Cir. Dec. 20, 2022) (odor *plus* erratic driving, visible cannabis and wad of cash in the car, knowledge that defendant had participated in controlled buys for cocaine, and alert from drug dog); *United States v. Malik*, 963 F.3d 1014, 1016 (9th Cir. 2020) (odor *plus* driver's admission that he had smoked marijuana, in a state where small amounts were decriminalized but use in moving car was a misdemeanor); *People v. Hill*, 2020 IL 124595, ¶¶ 16–17, 35 (odor *plus* visible cannabis in the car, driver's failure to pull over when officer turned on lights, and driver's admission that he smoked cannabis earlier that day, established probable cause when medical marijuana was legal but recreational was not).

but neither odor alone nor the mere presence of marijuana in a car will create probable cause. *See People v. Hall*, 271 Cal. Rptr. 3d 793, 800 (Cal. Ct. App. 2020) (collecting cases applying this rule); *United States v. Vasquez*, No. 19-50275, 2021 WL 3011997, at *2 (9th Cir. July 15, 2021) (recognizing same rule). Indeed, the Illinois legislature has essentially adopted this rule in its state code: "a person shall not be considered an unlawful user … *solely* as a result of his or her possession or use of cannabis." 410 ILCS 705/1-7 (emphasis added).

When analyzing the existence of probable cause in this case, this Court should apply the same rule. Cannabis odor may be a factor that contributes to probable cause, but the odor by itself is not a basis for an automobile search.

### 3.    Application

Barisch alleged after the search that he had smelled a "lingering odor" of cannabis coming from the car. (Supp. Tr. at 23.) But even crediting this assertion, the presence of cannabis odor alone would not have given Barisch probable cause for a search. Barisch was explicit during the suppression hearing that, although he thought he smelled cannabis, he saw no evidence of *illegal* cannabis use. "The car was parked. It wasn't driving. The impairment of, of the occupants at that time was—I didn't find necessary [to investigate]. Nobody was operating the vehicle." (Supp. Tr. at 40.) Barisch further repeated that because the couple was in the backseat, it looked like no one had been driving even if they were impaired. Supp. Tr. at 41. Without any additional indicia of

illegality, the smell alone did not create probable cause. *See, e.g., Armstrong*, 2022 WL 17169566, at *5.

In the district court, the government relied on several cases in which—prior to cannabis legalization—the smell of burnt cannabis provided probable cause for a search.[5] (R. 16 at 12–13.) But these cases are unhelpful in jurisdictions that have since legalized cannabis, a change in law that this Court has repeatedly recognized as a watershed moment under the Fourth Amendment. *See, e.g., United States v. Eymann*, 962 F.3d 273, 283 (7th Cir. 2020) ("in this era of increasing legalization of marijuana, coupled with widespread cultivation," interstate travel through high drug-trafficking areas now creates "only a small nudge in the direction of reasonable suspicion."); *United States v. Lickers*, 928 F.3d 609, 617 (7th Cir. 2019) (emphasizing cannabis smell established cause to search car only because events occurred *before* Illinois legislature legalized recreational marijuana use). Indeed, this Court has warned that any probable-cause analysis for marijuana possession in a state where possession remains a crime would not apply in a state, like Illinois, that has legalized marijuana possession across-the-board. *See United States v. Paige*, 870 F.3d 693, 701 n.19 (7th Cir. 2017).

The government also argued that even though cannabis is legal in Illinois, there are still illegal ways to transport it, illegal ways to consume it, and illegal amounts to possess.

---

[5] *See United States v. Kizart*, 967 F.3d 693 (7th Cir. 2020); *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008); *United States v. Mosby*, 541 F.3d 764, 768 (7th Cir. 2008); *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006); *United States v. Wimbush*, 337 F.3d 947, 951 (7th Cir.2003); *United States v. Mazzone*, 782 F.2d 757, 761 (7th Cir. 1986).

(R. 16 at 15.) But the government did not identify any facts in this case that could have led a reasonable officer to believe that Erving not only possessed cannabis, but *also* used it in an illegal manner. The government did not even identify facts showing that Barisch correctly identified the smell as cannabis. Recreational hemp products, which smell identical to cannabis, are legally consumed throughout the country.[6] And only "cannabis," not hemp, is subject to special restrictions when used or stored in a motor vehicle. *See* 625 ILCS 5/11-502.15 (restrictions on cannabis in cars on state highways); 410 ILCS 705/1-10 (defining "cannabis" to exclude hemp). The government cannot explain how Barisch would be able to distinguish between the two, when not even drug-sniffing dogs can. *See* Cynthia A. Sherwood et. al., *Even Dogs Can't Smell the Difference, The Death of 'Plain Smell,' As Hemp Is Legalized*, 55 Tenn. B.J. 14, 15 (2019). *See also United States v. DeLeon*, 979 F.2d 761, 765 (9th Cir. 1992) (vacating warrant when affiant was not qualified to recognize odor).

Of course, a cannabis-like odor is a *possible* indicator of improper cannabis use or storage—just as "it would always be *possible* that [a random] pedestrian was a bank robber, a hired killer on the loose, a drug lord or drug addict, or a pedophile with child pornography on his thumb drive." *Paniagua-Garcia*, 813 F.3d at 1014. But such speculation is not probable cause. Facts that are consistent with illegal activity—but equally consistent with legal activity—are not a sufficiently particularized basis for a

---

[6] See Emily Corwin, *Smoking Hemp Catches On*, NPR (Sept. 7, 2019), https://www.npr.org/2019/09/07/758578047/smoking-hemp-catches-on.

search. For example, even in jurisdictions where cannabis is *il*legal, observation of a hand-rolled joint will not create probable cause for arrest unless "other corroborating evidence" shows that the joint contains marijuana and not legal tobacco. *Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir. 1992). *See also United States v. Coates*, No. 22-1924, 2023 WL 2523501, at *3 (7th Cir. Mar. 15, 2023) (applying *Warlick*).

Finally, even if the government was correct that Barisch had probable cause to believe that Erving used cannabis in a manner not allowed by Illinois's Cannabis Regulation and Tax Act, that suspicion would still not justify a search under the automobile exception. The exception requires probable cause to suspect evidence of a *crime*, not merely evidence of a civil or municipal infraction. *See supra*, Section I.C.1. But when defending against Erving's motion to suppress in the district court, the government failed to identify any criminal statute that Erving or his companion may have violated.

The government speculated that Erving may have consumed cannabis in a public park or in close proximity of someone under 21 years of age, in violation of 410 ILCS 705/10-35(a)(3)(F) and (G), that Erving's companion may have possessed cannabis while under age in violation of 410 ILCS 705/10-15(b), or that Erving may have facilitated the use of cannabis by a minor in violation of 410 ILCS 705/10-35(a)(6). (R. 16 at 15–16.) But none of those provisions are criminal statutes. Possession by a minor is a "civil law violation," not a felony or misdemeanor. 410 ILCS 705/10-15(b). And § 705/10-35 merely carves out areas of law where state or local governments *may* create penalties

42

notwithstanding cannabis's general legality. 410 ILCS 705/10-35(a). Those provisions are not themselves punitive.

Instead, the Illinois code has a catch-all statute covering any use or possession of cannabis in a manner not allowed by Illinois law. 720 ILCS 550/4. Except for possession of large quantities of cannabis—something Barisch saw no evidence of in this case—violation of Illinois cannabis laws is by default a noncriminal "civil law violation." *Id*. The remedy for such a violation is that the State can seek a fine of between $100 and $200 to fund various county and state agencies and services. 720 ILCS 550/4(a). The State cannot seek criminal charges. And the government did not point to anything else in Illinois law suggesting that the State could seek criminal charges for any alleged conduct related to cannabis Erving may have engaged in.

Again, the facts known to Barisch at the time did not create probable cause that Erving had violated any of Illinois's cannabis laws. At most, Barisch had reason to suspect that Erving had used cannabis at some point earlier that day. But even if Barisch had reason to suspect that Erving somehow used cannabis improperly, that suspicion would at most apply to a noncriminal civil violation. It would not be grounds for a warrantless search. The automobile exception is not an alternative basis to affirm.

### 4. The elephant in the room: Possession of cannabis remains illegal under federal law.

This Court may be wondering about the tension between state and federal law regarding the legality of cannabis. In contrast to Illinois and many other states, possession

of marijuana remains illegal under federal law. *See* 21 U.S.C. §§ 801-971. This tension, however, is not relevant to the search in this case because the government waived any reliance on federal law when in the district court.

The government argued below only that Barisch had probable cause to believe that Erving violated *state* cannabis laws. (R. 16.) And when the district court asked the parties what effect, if any, federal law should have on the analysis, the government conceded that it was not prepared to discuss the issue. (App. at 5; Supp. Tr. at 64–65.) A party's decision to raise certain arguments, but not others, is evidence of an intentional decision and waiver of the unraised argument. *United States v. Flores*, 929 F.3d 443, 448 (7th Cir. 2019).

Although Erving cannot speak for opposing counsel, he notes that the government had good policy reasons for steering clear of federal law. Allowing state actors like Peoria Police Lieutenant Barisch to rely on federal cannabis laws would open a political can of worms the government may have wanted to avoid. Citizens of Illinois (and other states) would be unable to predict the consequences of their actions if they were repeatedly told by state officials that cannabis was legal yet remained subject to arbitrary enforcement of federal law by some state actors. Adding to the confusion, a hardline position on cannabis possession from the United States Attorney's Office in this case would also run counter to highly publicized positions from the federal government, such as widespread federal

pardons for simple marijuana possession.[7] In general, the government cannot adopt positions on appeal that it did not pursue in the district court. *See United States v. Buncich*, 20 F.4th 1167, 1172 (7th Cir. 2021); *Gutierrez v. Schomig*, 233 F.3d 490, 491 n.1 (7th Cir. 2000). And that is especially true when, as here, the government's avoidance of the Controlled Substances Act appears to have been intentional.

One last note: The issue of whether Illinois police can rely on the federal prohibition against marijuana for probable cause under the automobile exception is currently pending in this Court in *United States v. Jackson*, Appeal No. 23-1708. The parties are still briefing that case, and the government (the same United States Attorney's Office as this case) has not yet announced a position. If the government decides to rely on federal law, and switches gears in this appeal too despite its waiver in the district court, Erving will more fully address the effect of federal marijuana laws in his reply.

## D. Conclusion

Neither of the exceptions proposed by the government in the district court justified the warrantless search of Erving's car. This Court should reverse the district court's ruling denying Erving's motion to suppress and vacate Erving's conviction in Case No. 22-cr-10033 for the gun found in the car.

---

[7] The White House Briefing Room, Statement from President Biden on Marijuana Reform (Oct. 6, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/10/06/statement-from-president-biden-on-marijuana-reform/

## II.   The district court procedurally erred during Erving's sentencing by relying on speculation and a constitutionally prohibited factor in aggravation.

### A.   Standard of review

This Court reviews *de novo* claims of constitutional and procedural sentencing error. *United States v. Shaw*, 39 F.4th 450, 455 (7th Cir. 2022).

The government may plan to argue that Erving forfeited his sentencing claims by not raising them in the district court. But Erving did not have a chance to object because the court did not announce the reasoning for its sentence until the end of the hearing when it imposed judgment. Erving was not required to make an "exception" after the ruling had already been made. FED. R. CRIM. P. 51(a); *United States v. Pennington*, 908 F.3d 234, 238 (7th Cir. 2018). And the court did not follow the common practice of giving lawyers a final chance at the end of the hearing to raise any arguments or objections the court had not addressed. *Contrast, e.g., United States v. Burrows*, 905 F.3d 1061, 1067 (7th Cir. 2018). In part because the court did not follow this practice, Erving lacked a final opportunity to preserve his claims, and the default *de novo* standard applies. *See Shaw*, 39 F.4th at 456.

### B.   The district court engaged in improper speculation about Erving's prior sentencing hearing.

Criminal defendants have a due process right to be sentenced based on accurate information. *United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v. Oliver*, 873 F.3d 601, 608–09 (7th Cir. 2017). "Reliability is a central ingredient of the due process analysis." *United States v. Helding*, 948 F.3d 864, 870 (7th Cir. 2020). Accordingly,

sentencing determinations cannot be based on "speculation or unfounded allegations." *United States v. Newton*, 76 F.4th 662, 674 (7th Cir. 2023) (quoting *United States v. Nelson*, 774 F.3d 1104, 1107 (7th Cir. 2014)).

The district court admittedly engaged in unfounded speculation here. As a reason for rejecting Erving's argument that the PSR exaggerated his criminal history, the court said that Erving "probably" made the same arguments during his previous sentencing. (App. at 33.) The court conceded that it had not reviewed the transcript from that hearing. (App. at 33.) But it nonetheless rejected Erving's mitigation argument based on speculation about what Erving "probably" argued. (App. at 33.)

Speculation like the district court engaged in violates due process. *See, e.g., Newton*, 76 F.4th at 674 (vacating fraud sentence when loss calculation based on speculation about business); *United States v. Bradley*, 628 F.3d 394, 401 (7th Cir. 2010) (court impermissibly speculated about defendant's possible past crimes). Indeed, the error is serious enough that Erving would be entitled to relief even if he had forfeited the issue. *See United States v. Halliday*, 672 F.3d 462, 475 (7th Cir. 2012) (court plainly erred when it speculated that defendant believed child pornography was a victimless crime).

The district court compounded its error by explaining that, assuming Erving had raised similar arguments at his previous sentencing, the court would not consider those arguments again. (App. at 33.) District courts are required to address a defendant's principal arguments in mitigation that have legal merit. *United States v. Williams*, 887 F.3d 326, 328 (7th Cir. 2018) (citing *United States v. Donelli*, 747 F.3d 936, 937 (7th Cir.

47

2014), and *United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005)). Erving's arguments about his criminal history were one of his primary reasons for requesting a downward variance. Even if the court were correct that Erving had raised those arguments before at a *different* sentencing, the court could not ignore them by summarily adopting its conclusions from that prior hearing. *See United States v. Manyfield*, 961 F.3d 993, 996 (7th Cir. 2020) (vacating when court summarily imposed "the same [supervision] conditions that were imposed before" without explaining the justification for those conditions at current sentencing). The court especially couldn't reject Erving's mitigation arguments based on speculation about what "probably" occurred at that prior sentencing. (App. at 33.) *See Newton*, 76 F.4th at 674.

### C.    The district court improperly punished Erving for having children.

The district court's erred again was when it chastised Erving for fathering a child between his prior and current offenses. The Fourteenth Amendment grants Erving a fundamental right to familial association, and to "establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). *See also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (right to familial relations is "the oldest of the fundamental liberty interests recognized"); *United States v. Lee*, 950 F.3d 439, 448 (7th Cir. 2020) (same). The ability to bear and raise children is among "the most fundamental of all rights—the foundation of not just this country, but of all civilization." *United States v. Hollingsworth*, 495 F.3d 795, 801 (7th Cir. 2007) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir.2000)). The district court improperly punished Erving for exercising that right:

Now, I want to make one last comment. I wanted to leave—I don't mean this—I wanted to leave your children out of this, but these decisions you're making are now making it so that more children are growing up without the guidance of a father, but if you're going to make the choices you make, maybe that's better for them. But having said that, clearly the last child that you made, the one born in January was made probably while you were in a halfway house. These are simply poor decisions, and they keep leading to more poor decisions.

(App. at 37–38.)

The court should not have cited Erving's new child as a "poor decision" or aggravating factor. Erving's prior judgment did not have a condition forbidding him from fathering children. (Case No. 20-cr-10012, R. 20.) Nor could it have, as such a condition would have infringed upon Erving's "basic civil rights." *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (striking down forced sterilization for habitual offenders). And whether Erving fathered children out of wedlock was "irrelevant" at sentencing. *United States v. Barahona-Montenegro*, 565 F.3d 980, 985 (6th Cir. 2009) (court erred by relying on defendant's fathering children out of wedlock as a justification for sentence). By nonetheless punishing Erving for fathering children, the court essentially punished Erving for exercising his rights under the constitution. *See Meyer*, 262 U.S. at 399.

To be sure, the court's comments about Erving's kids were brief. But any comment that can "arguably" lead a reasonable observer to conclude that a court relied on a constitutionally impermissible factor will poison the judgment. *United States v. Trujillo-Castillon*, 692 F.3d 575, 579 (7th Cir. 2012) (national origin). *See also, e.g., United*

*States v. Kaba*, 480 F.3d 152, 158 (2d Cir. 2007) (appearance that national origin was a factor required remand, regardless of judge's subjective bias). Here, the district court explicitly cited Erving's child as one more "poor decision" in a pattern of "poor decisions." (App. at 37–38.) Regardless of the judge's personal views about Erving's parenting skills, the judge was not entitled to punish Erving for having "made" another child. (App. at 37–38.)

Accordingly, regardless of whether this Court reverses the district court's ruling on the suppression motion, it should vacate Erving's sentences and remand for resentencing.

**Conclusion**

This Court should reverse the district court's ruling on Erving's suppression

motion and vacate his conviction in Case No. 22-cr-10033.

Erving does not challenge his admission that he violated his supervised release and

was subject to revocation in Case No. 20-cr-10012. But this court should vacate his

sentence upon revocation in Case No. 20-cr-10012 and remand for resentencing. If this

Court does not reverse the suppression ruling, it should also vacate the sentence in Case

No. 22-cr-10033, as both cases involve the same sentencing errors.

Respectfully submitted,

THOMAS W. PATTON
Federal Public Defender

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
DAZMINE ERVING

**Certificate of compliance with Fed. R. App. P. 32(a)(7)(B)**

The undersigned certifies that this brief complies with the volume limitations of

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32 in that it contains

12,664 words as shown by Microsoft Word for Microsoft 365 used in preparing this brief.

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Dated: November 30, 2023

No. 23-2828 & 23-2831

---

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

DAZMINE ERVING,
Defendant-Appellant.

---

Appeal from the United States District Court
for the Central District of Illinois
Case No. 22-cr-10033 & 20-cr-10012
The Honorable Judge James E. Shadid

---

REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, DAZMINE ERVING

---

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main Street
Urbana, Illinois 61801
Telephone:    (217) 373-0666
Fax:              (217) 373-0667
Email: Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
DAZMINE ERVING

**Certificate of compliance with Circuit Rule 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of the

materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this

brief.

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Date: November 30, 2023

## Appendix table of contents

**Page**

Certification..............................................................................................................ii

Order denying motion to suppress, April, 24, 2023 ..........................................A1

Sentencing hearing transcript, September 6, 2023....................................A12

Judgment in a Criminal Case, Case No. 22-cr-10033 .....................................A40

Revocation Judgment, Case No. 20-cr-10012 .................................................A46

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA          )
              Plaintiff,          )
                        )
            v.          )          Case No. 22-CR-10033-JES-JEH
                        )
DAZMINE M. ERVING,          )
              Defendant.          )

## ORDER AND OPINION

This matter is now before the Court on Defendant's Motion (Doc. 15) to Suppress. The United States filed its Response (Doc. 16) in Opposition and the Defendant filed his Reply (Doc. 17). The United States requested an evidentiary hearing which was held on April 20, 2023. Doc. 18. For the following reasons, the Defendant's Motion (Doc. 15) to Suppress is DENIED.

### Background

On September 20, 2022, Defendant Dazmine M. Erving ("Defendant" or "Erving") was indicted on one count of Felon in Possession of a Firearm under 18 U.S.C. §922(g). This charge arises out of a search of a Red Durango that Erving was in by Peoria Police Officer Lieutenant Erin Barisch ("Barisch" or "Lieutenant Barisch") in the early morning hours on September 14, 2022. Erving moves to suppress the evidence obtained during that encounter on the grounds that Barisch's search of the car Erving was in violated the Fourth Amendment.

On April 20, 2023, the Court held an evidentiary hearing at the United States' request. The United States' called Lieutenant Barisch as a witness and he testified about the events leading up to the challenged search. The United States submitted as additional evidence several photos of signs posted around the park showing park rules, a GPS picture with additions to show where in the park the encounter occurred, and the footage and still excerpts from Lieutenant Barisch's body-worn camera from that night. Defendant cross-examined Barisch and called no other witnesses. The Defendant introduced into evidence a complete copy of the ordinance and

1

rules for the park. The following facts are taken from the evidence presented at the April 20, 2023 hearing.

In the early morning hours of September 14, 2022, at approximately 2:44 am, Lieutenant Barisch was on patrol in an unmarked police squad car patrolling an area which included the River Front Park on Morton Street in Peoria. As he was patrolling the area, he saw a Red Dodge Durango SUV backed into a parking spot in an otherwise vacant parking lot in the park. The Park was closed to the park at this time and the area was dark and not illuminated with any artificial lighting. Barisch drove towards the Durango and parked his police car roughly two car-lengths away. His headlights illuminated the ground area in front of the Durango, and he pointed the spotlight affixed on his car directly into the driver's side window of the vehicle. The light from the spotlight shone through the Durango's driver's side window and partially illuminated the interior of the vehicle. The vehicle's rear windows and rear trunk window were heavily tinted and the front windows and windshield were not tinted. Lieutenant Barisch used his handheld flashlight to further illuminate the vehicle.

Barisch exited his police car and activated his body-worn camera as he approached the Durango. He was able to see two people in the backseat of the car; one woman in the rear passenger seat and what he believed was a man sitting in the rear driver's side seat. The passengers were partially clothed. Barisch testified that as he approached, he saw both passengers make quick movements. He took specific note of one movement by the male passenger: quickly leaning down and then toward the rear of the back driver's seat toward the floorboard, and then quickly sitting back up. Barisch testified that he believed this motion could have been an attempt to conceal a firearm or contraband under the driver's seat. Barisch indicated in his report and in his testimony that he suspected that the passengers may have been

2

attempting to have sex, due to their being in the backseat of the car, in the park after dark , and their state of undress.

Barisch reached the rear passenger door and Barisch or the male passenger opened it and the male passenger put his hands up in the air. At this time, Barisch smelled the odor of burnt cannabis. He testified that he did not observe any other indicia of cannabis use at that point or subsequently, such as clouds of smoke, cannabis residue, or drug paraphernalia. The male passenger identified himself as Dazmine Erving and produced identification upon request. The female passenger identified herself initially as Adrianna Smith[1] but told Barisch that she had an Illinois driver's license but had left it at home. When asked for her date of birth, the female passenger told Barisch that it was 2/5/2005, which would have made her 17 at the time of the stop.

Lieutenant Barisch returned to his squad car to look up Erving and the female passenger in the law enforcement database LEADS. LEADS revealed that Erving was on federal supervised release for weapon offenses. When he entered the female passenger's given name and date of birth, LEADS returned "No Record on File." As she said she had a driver's license, the LEADS check should have returned a positive result and so Lieutenant Barisch concluded that she'd either given him a false name or false date of birth. Barisch returned to the Durango and asked Erving if he was on federal supervised release. Erving answered truthfully that he was and, upon further questioning, told Barisch that it was for weapons offenses and gave the name of his probation officer. Throughout the encounter, Erving had a calm and even demeanor and complied with Lieutenant Barisch's requests. Barisch asked Erving if there were any weapons in the car and Erving said there were not.

---

[1] She subsequently told officers that this was a fake name.

3

Barisch then told Erving and Smith to exit the vehicle and they did so. Erving asked if he could retrieve his shoes from the front seat and put them on, which Barisch allowed him to do. Barisch asked them to step to the rear of the vehicle and once there asked them to instead go to the front of the vehicle. As Erving and Smith walked to the front of the vehicle, Barisch took the opportunity to investigate the driver's seat area that he'd become suspicious of from Erving's earlier furtive movement. He leaned down and shined his handheld flashlight under the seat toward the rear and saw the barrel of a handgun. At this time, Lieutenant Barisch requested backup and arrested Erving. The firearm was retrieved from under the driver's seat and forms the factual basis of the charges Erving is facing in this case.

## DISCUSSION

Erving seeks to suppress the handgun that was found in the Durango and his subsequent statements on the grounds that Lieutenant Barisch's search of the car violate the Fourth Amendment. We begin with the well-settled proposition that the warrantless searches are per se unreasonable unless they fit within a well-recognized exception to the warrant requirement. *U.S. v. Thurman*, 889 F.3d 356, 365 (7th Cir. 2018). The United States argues that two exceptions applied to Lieutenant Barisch's search: the 'automobile' exception and a protective search under *Michigan v. Long*, 463 U.S. 1032 (1983).

### Automobile Exception

The United States argues that Lieutenant Barisch's testimony that he smelled cannabis provided probable cause to search the vehicle. They direct us to several cases where the Seventh Circuit that have held that the odor of cannabis alone is probable cause to search a vehicle. *See United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells marijuana from a car has probable cause to search that car.") (citing *United States v. Wimbush*,

4

336 F.3d 947, 951 (7th Cir. 2003)); *see also United States v. Kizart*, 967 F.3d 693 (7th Cir. 2020)

(odor of burnt cannabis after traffic stop for speeding provided probable cause to search vehicle).

However, each of these cases involves searches that occurred prior to the legalization of cannabis

in Illinois.[2] There is a split in the Illinois appellate courts about what effect legalization has had

on searches based on the odor of cannabis. *Compare People v. Stribling*, 2022 IL App (3d)

210098 ¶29 (Ill. App. 3d 2022) ("[T]he smell of the burnt cannabis, without any corroborating

factors, is not enough to establish probable cause to search the vehicle") *with People v. Molina*,

2022 IL App (4th) 220152 (Ill. App. 4th 2022) (reaching the opposite conclusion for the odor of

unburnt or raw cannabis).[3] This ambiguity has been recognized by other district courts in the

Illinois,[4] and the Illinois Supreme Court has granted leave to appeal to resolve the issue under

Illinois law. *See People v. Molina*, 2023 WL 2751668 (Ill. 2023) (granting petition for leave to

appeal and consolidating case with *People v. Redmond*, 2023 WL 2749120 (Ill. 2023)).

The Court asked the parties at argument what relevance, if any, it has that cannabis

remains illegal as a matter of federal law. The Defendant argued that because Lieutenant Barisch

was a local police officer empowered to investigate state and local laws, not federal, and

therefore the federal criminalization of cannabis should not play a role in our analysis. The

United States stated that it was not certain what effect it should have, but that the search was still

justifiable under Illinois law as well as local ordinances prohibiting smoking cannabis in the

park.

---

[2] While *Kizart* was decided on July 28, 2020, after legalization, the underlying traffic stop and search occurred pre-legalization in 2017. Brief for Appellee at 7, *United States v. Kizart*, 967 F.3d 693 (7th Cir. 2020); Cannabis Regulation and Tax Act, 410 ILCS 705/1-1 *et seq.* (legalizing possession of small amounts of cannabis on January 1, 2020).

[3] The United States incorrectly characterized these as unpublished opinions in their briefing and argument. Both *Stribling* and *Molina* are published decisions of the Illinois Courts of Appeals, as indicated by the lack of a U in their public domain designation. *See* Ill. Sup. Ct. Rule 23.

[4] *United States v. Griffin*, 023 WL 2266046 at *4 n.6 (N.D. Ill. Feb. 28, 2023).

Ultimately, the Court need not resolve this foggy issue as we find the stop constitutional under *Long*.

### Protective Sweep of a Vehicle under *Long*

In *Long*, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049-50. "*Long* searches are grounded in concern for officer safety,[] so if that concern is not present, *Long* does not justify the search." *U.S. v. Vacarro*, 915 F.3d 431, 436 (7th Cir. 2019) (citing *Arizona v. Gant*, 556 U.S. 332, 338-39 (2009)). The parties dispute whether Lieutenant Barisch could reasonably suspect that Erving was armed and dangerous.

The United States argues that the furtive movement that Lieutenant Barisch observed Erving make downwards as he approached the vehicle was an adequate basis for the search. Lieutenant Barisch testified that, based on his experience as a law enforcement officer, he believed that this movement downwards towards the floor of the Durango was consistent with Erving attempting to hide a firearm. The United States directs us to several cases that held that they contend hold that furtive movements alone can be sufficient to form the reasonable suspicion required under *Long*. *See Vaccaro*, 915 F.3d at 436-37; *U.S. v. Evans*, 994 F.2d 317, 321-22 (7th Cir. 1993). In *Evans*, a driver leaned his body forward prior to a traffic stop and the officers inferred that he was reaching under the seat to place or retrieve something. *Id.* In *Vaccaro*, a driver made two movements prior to a traffic stop, one bending at the waist and another leaning back into the back seat of the vehicle, which the officers interpreted as either

hiding or retrieving weapons. *Vaccaro*, 915 F.3d at 434. In both cases, the Seventh Circuit held

that the officers upheld the searches under *Long* based in part on the furtive movements.

Defendant argues that each of these cases is readily distinguishable. They note that *Evans*

occurred in a high crime area and the defendants had voluntarily stopped in front of a "reputed

distribution point for drugs" which the court found supported the reasonableness of officers'

safety concerns. *Evans*, 994 F.2d at 321. Defendant seeks to distinguishes *Vaccaro* on the

grounds that the movements in that case were described as a "vey ferocious move by bending at

the waist" followed by a second "aggressive move with [the defendant's] entire top torso and

both arms into the back seat of the vehicle." *Vaccaro*, 915 F.3d at 434.[5] The Court finds that

these differences are not enough to distinguish *Evans* and *Vaccaro* from the case at hand,

especially given the additional information that Barisch learned during his investigation as

discussed below. Assuming that Defendant reading is  correct and *Vaccaro* and *Evans* require

furtive movements plus other facts that support the officer's reasonable suspicion, that was

satisfied here.

In addition to these factual differences, Defendant argues that any reasonable suspicion

was undermined by the likely innocent explanation for any movements- namely, that he was

undressed and trying to get dressed quickly. Lieutenant Barisch's initial report indicated that as

he approached the vehicle, he suspected that Erving and the woman in the car were in the park to

have sex. This was based on their relative states of undress, their presence in the park after hours,

their being in the back seat of the vehicle and not the front, and his law enforcement experience

indicating that couples would sometimes use the park after hours as a hookup spot. Defendant

---

[5] Defendant also seeks to distinguish *Vaccaro* based on the fact that the officers in *Vaccaro* claimed to see a rifle case in the defendant's car before the search. While that is true, both the District Court and the Seventh Circuit both held that their testimony on that point was not creditable and so is not an important distinction for this case. *Vaccaro*, 915 F.3d at 434-35.

argues that any movement that Lieutenant Barisch observed was consistent with his efforts to get dressed and that this innocent explanation undercuts the basis for Barisch's suspicion. The Defendant also challenges Lieutenant Barisch's ability to observe the movement in question. It was dark out, there was no lighting save the headlights and spotlight form Barisch's squad car and his own flashlight. The rear windows in the Durango were semi-tinted and his view through the front would have been partially obscured by the headrests. Defendant also notes that Barisch testified that the other person in the car was a female but said he believed Erving was a male as he approached.

When there is a proffered innocent explanation for a defendant's conduct, an officer is not required "to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018). The probable cause and reasonable suspicion inquiries are based on what a reasonable officer "could conclude- considering all of the surrounding circumstances, including the plausibility of the [innocent] explanation itself." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)). While he did not discount his comments in his police report that Erving and the woman may have been having or about to begin having sex, he testified that the movement he observed was not consistent with getting dressed. He described it as a "quick movement leaning down and then quickly back up." When asked if this movement could have been to pull up his pants or otherwise get dressed, he stated that in his experience "the movements of trying to get dressed would have been significantly longer and different…. if he had his pants down, the movement wouldn't have been leaning down; it would have been trying to pull up, and he would have had to lean back to pull his pants up over his knees, up his thighs and up over his butt" and that would have been more of an "up-and-leaning back movement."

The Court finds Lieutenant Barisch's testimony that he saw the movement credible and that it was a reasonable inference that Erving's movement was for the purpose of hiding something. While it was dark out, the car was lit through the untinted windshield and front windows by a spotlight, his headlights, and his flashlight. His testimony that he observed the movements in question is bolstered by the manner he carried out the search. He testified that he observed Erving in the backseat make a downward motion towards the floor of the vehicle. After asking Erving and the woman to exit the vehicle, the first place that he looked was under the driver's seat and just by shining his flashlight under the driver's seat he was able to see the barrel of the gun. He looked at this one location rather than conducting a full search of the vehicle or the more obvious locations and this is consistent with his testimony that he focused in on the area under the driver's seat because of Erving's motion. Of the two interpretations of Erving's movements -the defense's preferred interpretation that he was dressing himself quickly to be presentable when Barisch arrived, or the United States' that he was hiding something- the second was a reasonable inference from the facts that Barisch knew at the time of the search. The alternative proposed by the Defendant does not make unreasonable Barisch's conclusion that a quick motion to put something under the seat as a police officer approached could be used to hide a weapon or contraband.

Lieutenant Barisch's suspicion that Erving was armed and dangerous was bolstered by what he learned during his investigation. After asking Erving and the woman in the car for their names and identification, Barisch looked them up in the law enforcement database LEADS. In doing so, he learned that Erving was on federal supervised release. When he returned to the car, Barisch asked Erving who confirmed this and he told Barisch that he was on supervised release for weapons offences, for possession of a firearm. A "law enforcement officer's knowledge if a

suspect's criminal history may support the existence of reasonable suspicion" when it is coupled

with additional facts. *U.S. v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005). Based on the "No

Records on File" result for the information the woman gave him, that she was either lying about

her date of birth or her name. Barisch's suspicion that Erving had hidden something under the

driver's seat, combined with him being on federal supervised release for weapons history and the

false information provided by the woman was an adequate basis for reasonable suspicion.

The Defendant argues that any inference of dangerousness was undercut by the fact that

Lieutenant Barisch allowed Erving and the woman considerable freedom of movement during

the stop. He notes that Barisch allowed the woman to go into the front area of the vehicle and

retrieve items from the glove compartment, allowed her to take her purse with her when she left

the vehicle, and subsequently let her call her mother. The Court notes that some of this occurred

after the search, and is therefore of limited relevance to this inquiry. To the extent it has any

relevance on whether Barisch could have reasonably suspected that Erving was armed, Barisch

testified that after he confirmed where the weapon was, he was unconcerned about Erving and

the woman's movements that were not near the weapon.

The second prong of "*Long* inquiry requires the government to establish that the officers

reasonably suspected that [Erving] could gain immediate control of weapons in the vehicle."

*Vaccaro*, 915 F.3d at 437 (internal quotations suppressed). This is easily satisfied here. It is

undisputed that Erving and the woman's presence in the park afterhours was nothing more than

an ordinance violation punishable on the first offense by a $50 fine. Lieutenant Barisch had no

other basis to arrest Erving so he would have gained access to the weapon as soon as Barisch

finished writing a citation.

10

The facts of this case are a close call but the Court finds that the furtive movement that Lieutenant Barisch observed combined with the knowledge that Erving was on federal supervised release for weapons offences, that his female companion was lying about her age or name, and the smell of burnt cannabis was an adequate basis for reasonable suspicion under *Vaccaro* and *Evans.* A reasonable officer could conclude from these facts that Erving had hidden a weapon under the driver's seat and was therefore armed and dangerous and could have gained access to the weapon if released. As such, Lieutenant Barisch's search was not in violation of the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion (Doc. 15) to Suppress is DENIED.

Signed on this 24th day of April, 2023,

s/ James E. Shadid_____
James E. Shadid
United States District Judge

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF ILLINOIS

3

4    UNITED STATES OF AMERICA,      )
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       )    Criminal No. 1:20-10012
                                    )    Criminal No. 1:22-10033
7                                   )
     DAZMINE M. ERVING,             )
8                                   )
               Defendant.           )
9

10              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES E. SHADID
11               SENTENCING HEARING
            SEPTEMBER 6, 2023; 8:59 A.M.
12               PEORIA, ILLINOIS

13
     APPEARANCES:
14

15   For the Government:      RONALD LEN HANNA, ESQUIRE
                              Asst. United States Attorney
16                            211 Fulton Street, Suite 400
                              Peoria, Illinois 61602
17                            (309) 671-7050

18

19   For the Defendant:      JESSICA DOUGLAS, ESQUIRE
                             Federal Public Defender
20                           401 Main Street, Suite 1500
                             Peoria, Illinois 61602
21                           (309) 671-7891

22

23          Jennifer E. Johnson, CSR, RMR, CRR
                 U.S. District Court Reporter
24               Central District of Illinois

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer

1        (Proceedings held in open court.)

2        THE COURT:  Good morning.  This is the United

3   States v. Dazmine Erving with -- who is present

4   with Miss Douglas in 20-10012 and 22-10033.

5   Mr. Hanna present for the government.

6        This matter is set today for sentencing on

7   22-CR-10033 and for hearing on the petition in

8   20-10012.

9        Are the parties ready to proceed?

10       MR. HANNA:  Yes, Your Honor.

11       MS. DOUGLAS:  Yes, Your Honor.  And I believe

12   on the petition he's already pled guilty so that

13   would be a sentencing as well.

14       THE COURT:  Okay.  Very good.  Thank you.

15       So, with regard to both cases then, a

16   violation memorandum has been prepared in

17   20-CR-10012 and a presentence report has been

18   prepared in 22-CR-10033.  It appears, if there were

19   any objections, they have been addressed and

20   resolved.

21       Is that correct, Mr. Hanna?

22       MR. HANNA:  Yes, Your Honor.

23       THE COURT:  Miss Douglas?

24       MS. DOUGLAS:  Yes, Your Honor.

25       THE COURT:  All right.  Let me adopt the

 1  presentence report and the violation memorandum
 2  today.
 3       And that would have then in 22-CR-10033 a
 4  Total Offense Level of 13, Criminal History
 5  Category of VI, a guideline range of 33 to 41
 6  months, supervised release of one to three years,
 7  ineligible for probation, $5,500 to $55,000 fine,
 8  restitution not at issue, a $100 special
 9  assessment.
10       With regard to 22 -- or 20-10012, have a Grade
11  Violation B, Criminal History Category of VI,
12  guideline range of 21 to 24 months, supervised
13  release of three years minus any term of
14  imprisonment imposed upon revocation, and a balance
15  of $75 on the special assessment.
16       Do the parties agree that those are the
17  guideline provisions in both cases?
18       MR. HANNA:  Yes, Your Honor.
19       MS. DOUGLAS:  Yes, Your Honor.
20       THE COURT:  Any additions or corrections to be
21  offered to the presentence report?
22       And I have received a sentencing memorandum on
23  behalf of Mr. Erving which is Docket Number 25.
24       Anything from the government?
25       MR. HANNA:  Nothing from the government, Your

1 Honor.

2      THE COURT:  Anything further from the defense?

3      MS. DOUGLAS:  No, Your Honor.

4      THE COURT:  Any formal evidence from either

5 side?

6      MR. HANNA:  None from the government, Judge.

7      MS. DOUGLAS:  None from the defense.

8      THE COURT:  Argument?

9      MR. HANNA:  May it please the Court and

10 Counsel.

11      Mr. Erving's criminal history is significant,

12 Your Honor, reviewing that first and foremost.  As

13 actually set forth in the sentencing memoranda of

14 the defendant, he has a 2009 -- he actually has

15 five felony convictions starting in 2009.

16      First, a 2009 mob action at the age of 18, was

17 sentenced to 18 months in prison.  He has a felony

18 -- second one in 2011 for obstruction of justice,

19 was sentenced to 30 months in prison.  2012, has a

20 criminal contempt conviction, six months in jail.

21 2013, felon in possession conviction when he was

22 sentenced to five and a half years in prison; that

23 was at age 22.

24      I would note that the presentence

25 investigation report -- which is well-written and

1   thorough -- indicates that he was on parole at the

2   time of that offense.

3       A 2018 felon in possession of ammunition for

4   which he was sentenced to five years imprisonment.

5   And then his fifth felony was a -- another felon in

6   possession of a firearm where he was sentenced in

7   this courthouse to 37 months in prison; that was at

8   age 29.

9       That's a total of 17 criminal history points

10  for those offenses plus the two-point enhancement

11  for being under a sentence of supervision at the

12  time that the offense was committed in the instant

13  case.

14      To address the matter in the sentencing

15  memoranda, the Department's position is that we

16  apply the guidelines as they are today.  These

17  won't go in effect -- those changes -- until

18  November of this year, and the effect in this

19  particular case would be to reduce the criminal

20  history points from a 19 down to an 18.  That has

21  no effect on the ultimate criminal history category

22  that he lands in, which is the highest possible VI

23  in this case.  So, even if that were effective

24  today, even if it were to apply retroactively, we

25  believe there wouldn't be any effect on the

 1 | ultimate criminal history category, and we're
 2 | asking the Court to impose the guidelines advisory
 3 | as they are today which in this case, with a total
 4 | offense level of 13, Criminal History Category of
 5 | VI, results in a range of 33 to 41 months for the
 6 | new conduct.

 7 | And then the revocation matter, of course, is
 8 | as indicated in the violation memoranda, which is
 9 | also very well-written, is a sentencing guideline
10 | range of 21 to 24 months.

11 | The government believes certainly that the
12 | guidelines are a starting point for fashioning an
13 | appropriate sentence in this case.  We are asking
14 | for a guideline sentence within both of those but
15 | for both of those to be entirely served
16 | consecutively to one another.  So, a guideline
17 | range within 33 to 41 months is appropriate and
18 | then to be imposed consecutive to a sentence that's
19 | within 21 to 24 months.

20 | That will be the government's recommendation,
21 | with a year -- a three-year term of supervised
22 | release to follow.

23 | This defendant was sentenced in 2020 to 37
24 | months in the Bureau of Prisons.  That offense was
25 | a felon in possession case where he fled the

```
 1   police, had a stolen firearm on him.  And as set
 2   forth in the paragraph 39 of the presentence
 3   investigation report, he had only been out of
 4   custody for 30 days from his previous offense in
 5   that case, and he stated that he needed that gun
 6   for protection.
 7       He then served a sentence in the Bureau of
 8   Prisons, 37 months, out of this courthouse.  Went
 9   to the residential re-entry center on January 5th
10   of 2022.
11       As the PSR indicates, he was sanctioned three
12   times for cocaine use during that residential
13   re-entry center stay.  He was also sanctioned for
14   not being compliant with his movement.  So, there
15   was non-compliance during the period of time when
16   he was in the residential re-entry center and then
17   was released from prison, from that sentence
18   ultimately on September 2nd of 2022.
19       And as the facts would dictate in this case,
20   it was only 12 days later after he was released
21   from his RRC case that he found himself -- or I
22   guess he put himself, would be more appropriate, in
23   a position where he was arrested on September 14th
24   of 2022 in possession of a loaded Springfield XD
25   9 millimeter firearm.
```

1    He was prohibited from possessing a firearm
2  due to all those felony convictions at that time.
3  That was a stolen firearm, he admitted again,
4  stating that that firearm was for protection and
5  that he had purchased it two days prior for $150
6  from a drug user.

7    At the time of this incident, as Your Honor
8  heard during the suppression hearing in this case
9  and saw on video, the defendant was out in the
10  early morning hours, was -- there was an odor of
11  cannabis in the vehicle.  When Officer Barisch --
12  Lieutenant Barisch approached the vehicle, the
13  defendant was in the backseat of the vehicle with a
14  juvenile female.  It was after hours, dark parking
15  lot, and there was a firearm right at his feet, to
16  which he again explained that he needed that
17  firearm for protection.

18    There's obviously a significant recurring
19  theme here with the defendant's behavior, his
20  proclivity toward the use and possession of
21  firearms, his excuse that he's provided multiple
22  times now, having been sentenced to significant
23  terms of imprisonment, stating that he needs a
24  firearm for protection is an indication that a
25  significant sentence in this case is necessary to

1   protect the public from further crimes of this

2   defendant, from future possession of a firearm for

3   this defendant because the sentences in the past

4   did not deter that conduct.

5       So, a significant, specific deterrence is

6   necessary in respect to the sentence that should be

7   imposed in this case.

8       There's also a need to reflect the seriousness

9   of the offense.  It's notable -- it's unignorable

10  actually that he has been sentenced to five and a

11  half years in prison for the first felon in

12  possession case; that again was committed while he

13  was on parole.  Then he's released from that and is

14  sentenced to another five years in prison and then

15  comes to federal court and gets 37 months in

16  prison.

17      So, it doesn't make sense to go any lower

18  certainly and give him a break at this point in

19  time because it doesn't appear to be having an

20  effect on deterring his conduct.

21      So, the government believes that the

22  sentencing guidelines are appropriately calculated

23  here.  A consecutive sentence is necessary to

24  achieve all the factors that are set forth in 3553,

25  and that these are serious offenses.

1    And it just can't be that it is necessary to

2   possess a firearm in the city of Peoria to be safe.

3   A lot of that has to do with where you go, who you

4   associate with, what time are you out and about,

5   where are you putting yourself.  It just cannot be

6   that it is necessary to possess a gun unless you're

7   putting yourself in a position where you may need

8   to use that firearm, and that's what this defendant

9   has done.  If he's in a position where he believes

10  he needs to use a firearm or possess a firearm to

11  keep himself safe, he is in control of those

12  factors.

13    And the government believes that a sentencing

14  guideline sentence in this case of three years of

15  supervised release would be fully appropriate, Your

16  Honor.

17    Thank you.

18    THE COURT:  Thank you, Mr. Hanna.

19    Miss Douglas?

20    MS. DOUGLAS:  Your Honor, Opposing Counsel,

21  thank you.

22    First, Judge, he would have credit here for

23  just shy of a year from September 12th of 2022.  We

24  are asking for that credit.

25    As you see in my sentencing memorandum, the

1    first thing I'm also going to address is criminal

2    history.  We are asking the Court to find an

3    overstatement and, in fact, adjust this to a

4    Category V.

5        First, with regards to the guideline

6    adjustment that the Sentencing Commission has

7    released as of August 24th of 2023, the National

8    Sentencing Resource Counsel is recommending

9    removing those two points.  My understanding is

10   that intentionally will become retroactive.  The

11   government is correct that it doesn't take place

12   until November of this year, but we are asking the

13   Court to factor that in since that does appear to

14   be the direction of the Resource commission.

15       THE COURT:  And like I did yesterday, I will

16   do so again today, but do you agree that it does

17   not change the -- like yesterday it may have

18   changed the criminal history category, but today it

19   doesn't.

20       MS. DOUGLAS:  Right.  With regards to those

21   two points, it would take him from a 19 to a 17

22   which would still be a Category VI.

23       In addition to that, I would also be pointing

24   out, paragraph 34 of the PSR talks about this mob

25   action when the defendant was sentenced to 18

1  months in prison.  This -- my understanding in
2  looking at the underlying facts was this was a
3  fight at a school between several parties.  It's
4  our position that a sentence of 18 months was
5  excessive for that.  There did not appear to be any
6  additional charges suggesting that there was
7  serious bodily injury or anything of that nature.

8  Additionally, PSR paragraph 36 describes the
9  conviction for contempt of court.  Here, two
10 criminal history points were assessed.  The issue
11 with that one, Judge, is he was noticed in as a
12 material witness; and if you look at his record, he
13 was in custody at the time.  So, although he may
14 have failed to appear to testify, in reality he has
15 no ability to remove himself from jail and appear.
16 If the government needed him as a material witness,
17 they would have had to file a various amount of
18 documents to get him there.

19 That then brings us to a conviction for
20 obstruction in Woodford County.  Again, he was 20
21 years old at this time, Judge.  This is paragraph
22 35.  And if you look at the violations of probation
23 for that one, it was for missing two meetings with
24 Probation, a failure to make payments toward costs
25 and fines, and a failure to maintain his address.

1   The underlying case, he was a -- in a vehicle with

2   other individuals.  He provided his brother's name

3   when he was questioned about marijuana.  That was a

4   false name.  That case in itself carries three

5   criminal history points.

6       So, when you look at those points, that's

7   eight points plus the two points for the adjustment

8   from the guidelines which would bring him to ten

9   points, Judge, instead of nine.  We would argue

10  that that justifies reducing his criminal history

11  category to a Category V with the low end of the

12  guidelines there being 30 to 37 months.

13      It's our position the sentence of 30 months

14  concurrent with the violation of supervised release

15  would be appropriate in this case.

16      Moving into the 3553(a) factors, he's 32 years

17  old, has three dependents.  His most recent son was

18  born in January of this year.  He has made plans to

19  relocate after this case.

20      One thing that, I think, is notable here,

21  Judge, is you see on the first page of his

22  presentence report that he left the gang he was in

23  in 2010.  It is very rare that -- even Probation

24  acknowledges -- that someone has gotten out of the

25  gang life-style.

1    While we may all believe it's inappropriate

2  and he shouldn't need a gun in Peoria, I think that

3  fear is real and is grounded, and certainly there

4  is some inherent risk when you reject a gang and

5  decide to try not to be involved in that conduct.

6    His offenses since that time have ostensibly

7  been firearm offenses which, in one sense, is

8  problematic as the government points out, but when

9  you look at the facts like in this case during the

10  motion to suppress, he was in a park after hours

11  with another individual.  There was potentially the

12  odor of marijuana, but there was no major law

13  violations going on, no major drug activity.  He

14  wasn't with other gang members.  He did take

15  responsibility for the firearm, admitted what he

16  had done, but he wasn't brandishing it or planning

17  to use it to harm anyone.

18    What is compounding that, Judge -- and that's

19  why he's actually not asking for RDAP this time,

20  but he's asking for ongoing therapeutic services,

21  to serve his sentence at Marion to address some of

22  these medical issues.  He was diagnosed with

23  anxiety, ADHD and major depressive disorder.

24  That's in the PSR, paragraph 62 to 68.

25    And then again compounding that, if you look

1    at his upbringing, starting in paragraph 47, he

2    talks about being raised in the Taft Homes and

3    having a father in prison and a mother who

4    ostensibly was not able to parent.  He ends up on

5    the streets at about 16 years old.  He witnesses

6    his best friend being murdered in the streets at

7    that time.  What's interesting is that coincides

8    with the beginning of his substance abuse.  That's

9    PSR page 69 to 78.

10        In the evaluations he's had, that talks about

11    the substance abuse being a mask to deal with the

12    trauma of what he witnessed as a teenager.  That

13    couples with this ongoing mental health disorder

14    and this constant sense of feeling like he's in

15    immediate danger.  Yes, he has taken some actions

16    to put himself there, but this also began when he

17    was 16; and he has taken some actions, such as in

18    2010 separating from the gang he was affiliated

19    with in an attempt to go a different direction.

20        He did earn his GED, and he continues to take

21    those steps, as you can see through Probation's

22    report.

23        And outlined in paragraphs 53 and 56 are his

24    plans for release.

25        He did carve out an appeal right with regards

 1  to the denial of the motion to suppress.  The
 2  government agreed to that.

 3       But we do believe, Judge, that a sentence of
 4  30 months with credit for the time that he's been
 5  in to run concurrent with the violation would be
 6  appropriate in this case.

 7       Additionally, he is asking for Marion.  He has
 8  several heart medications that he's supposed to be
 9  on.  He's had heart issues since he was 16.  And he
10  reports to me that it's hit-or-miss when Peoria
11  County administers that medication.  He was
12  previously detained in Marion and said that they
13  did address his cardiac needs appropriately, so
14  that's why he's requesting to return there.

15       And he would like to make a statement as well,
16  Your Honor.

17       THE COURT:  Thank you.

18       Miss Douglas, have you gone over paragraphs
19  104 through 115 with Mr. Erving?  These are the
20  proposed conditions of supervised release.  And do
21  you -- do you have any objection to those?

22       MS. DOUGLAS:  We have reviewed them, Judge.
23  We have no objection, and we would waive the
24  reading.

25       THE COURT:  All right.  Thank you.

1    Mr. Hanna?

2    MR. HANNA:  Your Honor, may I briefly address

3    the argument, with regard to sentencing, the

4    criminal history category?

5    THE COURT:  Sure.

6    MR. HANNA:  I believe the -- I've reviewed the

7    prospective changes in the document of April 27th

8    of 2023, and I believe it will cause a change that

9    will add one point if the defendant receives seven

10   or more points under Subsections (a) through (d).

11   So, I believe Miss Douglas stated it would reduce

12   his sentence -- or, I'm sorry, his criminal history

13   points from 19 to 17.  I believe it would only

14   reduce it one point, and it would go from 19 to 18.

15   I still don't think it matters, but for the

16   purposes of clarity, it would be a one-point

17   reduction from the criminal history.

18   MS. DOUGLAS:  And that's possible, Judge.

19   I've quoted the language.  There's -- for lack of a

20   better term, it's like a "choose your adventure"

21   situation so we're going to have to see how it

22   actually plays out.

23   THE COURT:  Okay.  Mr. Erving, at this time

24   you have an opportunity to make a statement if you

25   wish.

1    THE DEFENDANT:  Yes, sir.  I'm not sitting

2  here to make any excuse for possessing a gun or

3  saying I didn't.  I possessed a weapon for one

4  reason -- the potential to protect myself.

5    As you can see in the last week or so, it's

6  been so much gun crime violence here in Peoria.

7  It's not that people are just waking up, going to

8  get guns to hurt people with an intention to just

9  cause violence.  The way I grew up is no one was

10  there for me, so I had to find a way to survive.

11  The only way I knew to survive is I took to the

12  streets at an early age.

13    But once you get involved with something, it's

14  hard to step away from it.  You can step away from

15  it, but that doesn't mean it's not going to come

16  after you.  It's been coming after me my whole

17  life.  I've been going through trauma just seeing

18  what's going on outside of what everybody else is

19  living.  It's different when you live inside of

20  that.  It's a hell.  You can't -- you can escape

21  it, but it definitely will follow you.  Like I've

22  been trying to get away from it, but it's, it's no

23  escape here in Peoria.  Like you can't get away no

24  matter -- once you're a target, you, you not gonna

25  make it out.  Only people survive mostly is if you

1  move away or you do something stupid and get a
2  bunch of time in prison.

3      So, I'm not making no excuse, saying, *Don't*
4  *send me to prison*, or whatever for the gun.  Yes, I
5  possessed that weapon.  I had one intention --
6  protecting myself.  That was it.  I didn't have it
7  to go just hurt no one or nothing like that.

8      That's the only thing.  I'm just trying to
9  survive.  That's my biggest thing is just
10  surviving, trying to do something different, but
11  it's hard when you don't have financial stability
12  to make it out.  To just get out of prison and, *Oh,*
13  *I'm gonna do this and change*.  You have to take the
14  steps.

15      Yeah, I took the steps.  Mentally I got a lot
16  going on; yeah, I understand that, so I'm trying to
17  seek help for that also.

18      But you can't just be like, *Oh, I quit*.  They
19  -- usually people don't be able to just, *Oh, I*
20  *quit*.  When you try to quit, something usually
21  happens to you.  You don't make it.

22      So, I don't -- I don't sit here and say what
23  Hanna is saying about me is wrong and what
24  Miss Jessica is saying about me is correct.  Yeah,
25  I committed the crime.  All I'm trying to do is

1    survive.  That's it.  I just want to be here to

2    protect my life and feel like I don't have to just

3    go out here, because I'm a convicted felon, I don't

4    have a right to try to stay alive.

5        It's a lot of people -- like everyone in this

6    courtroom, they wouldn't want no one to just come

7    up and just try to take their life.  You're gonna

8    fight to protect yourself.  But this the only way

9    that I know to do it with what's going on in

10   society today.  It's not just in the lower-level

11   communities.  It's everywhere in the world there's

12   gun violence.  You have people with registered

13   firearms and legally purchased guns going to stores

14   and communities and killing kids, children, people.

15   And they're not even experiencing no violence.

16   They just waking up, *Oh, I'm gonna go commit this*

17   *crime.*

18       But I only possessed the gun to protect myself

19   from this type of violence in this society.  That's

20   it.

21       So, I'm not making an excuse, but that's my

22   only reason I ever possessed any guns in my life is

23   to protect myself and my family for survival.  It's

24   not to cause havoc upon no one unless someone is

25   going to just physically come near, point a gun and

1  use it to hurt me.  That's the only reason I will

2  possess a gun for.  I'm not possessing it to just,

3  just have it just to, *Oh, I got a gun*.  That's not

4  my intention.  My intention was just to protect

5  myself.  That's it.

6       THE COURT:  Okay.  Thank you, Mr. Erving.

7       THE DEFENDANT:  You're welcome.

8       THE COURT:  The Court, having considered all

9  the information before it, which includes the

10  presentence report, the violation memorandums, the

11  sentencing memorandums, the prior presentence

12  report, the arguments of counsel, the statement of

13  Mr. Erving, the factors in 3553 believes the

14  following sentence is sufficient but not greater

15  than necessary to comply with the purpose of the

16  Act.

17       A couple of points, and then I'm going to get

18  to your comments.  First the Court will -- whether

19  it's one point or two -- will acknowledge that

20  those should not be factored in when addressing the

21  criminal history points as they're about to change,

22  and so that reduction will occur.  That doesn't

23  change the criminal history category, but

24  Miss Douglas argues why the criminal history

25  category is overstated and points to an

 1   obstruction, a contempt, and a mob action.  And if

 2   those were ignored or set aside or excused, might

 3   change the Criminal History Category from VI to V.

 4        But I would likely say -- and I haven't

 5   reviewed the transcript of the previous sentencing,

 6   Miss Douglas -- that that argument was probably

 7   made by defense counsel at that time when

 8   Mr. Erving was sentenced to 37 months for a gun

 9   violation which ironically, the criminal history,

10   the guideline range was the same then as it is now,

11   33 to 41 months.

12        So, I'm not sure that we can continue to make

13   those arguments if people continue to commit the

14   same crimes.

15        But I would say, Mr. Erving, you're making it

16   difficult for people to defend you and make these

17   arguments by continuing to commit these same

18   crimes.

19        And I would say to your comments that I don't

20   have any reason to dispute anything you just said

21   to me -- that you only want these guns for your own

22   protection or protection of your family, that you

23   don't intend to use these guns to cause harm to

24   others as others have done on our streets.

25        And I'm not naive enough to think that it's

1  easy to just say to you, *Well, you should move to*
2  *another community,* or, *You should put the guns down*
3  *and go find a job,* because, frankly, I know just as
4  well as you do that even though you do have some
5  employable skills, your criminal history and
6  specifically when somebody learns of the number of
7  gun crimes, which now total four, that you're
8  likely not going to be hired or it's going to be
9  difficult for you to be hired.

10      So, I don't know what to tell you.  I don't
11  have any answers for you.  I just know this:  That
12  if you're carrying that gun to defend yourself,
13  then likely there would be a point in time where
14  you would need to do so or feel that you may need
15  to do so; and then you're going to use that gun,
16  and you're just going to contribute to the gun
17  violence that we have in this city and in many
18  cities around the country.

19      So, it's not the answer.  You know it, and I
20  know it.  And all it's done is continue to bring
21  you to this courtroom and other courtrooms in an
22  orange jumpsuit and to be sentenced once again.

23      I'm not saying that if I were in your shoes --
24  I would hope that I'm never -- I'm not in your
25  shoes or that others in your shoes wouldn't think

 1  the same way, and I'm -- and again, I'm not saying

 2  that I argue with your rationale, but it's not

 3  serving you well.  Maybe it's keeping you alive.

 4  Maybe going back to prison is actually keeping you

 5  alive and saving your life.  But you're going to

 6  have to find another way, and it seems that you're

 7  smart enough to be able to do so but haven't

 8  somehow figured that out yet.

 9      So, I have to sentence you because there is a

10  need to protect the public from you.  Regardless of

11  whether you believe yourself that this is only to

12  protect yourself, there is a need to deter others,

13  and I have to address the seriousness of the

14  offense.

15      So, with that said, I believe a sentence of 41

16  months to the Bureau of Prisons is sufficient but

17  not greater than necessary to comply with the

18  purpose of the Act, and that is in 22-CR-10033, and

19  that will be followed by a term of 24 months in

20  20-10012 consecutive to 22-CR-10033.

21      That will be followed by three years of

22  supervised release.

23      I'll find no ability to pay a fine, so no fine

24  is imposed.

25      While on supervised release, not commit

1  another federal, state or local crime.  Not
2  unlawfully possess a controlled substance.

3      Submit to one drug test within 15 days of
4  release from imprisonment and at least two
5  thereafter as directed by Probation.

6      Cooperate in the collection of DNA as directed
7  by Probation or the Bureau of Prisons.

8      In addition, I have carefully reviewed
9  paragraphs 104 through 115 of the proposed
10 conditions of supervised release.  I find no
11 objection to them.  I find them each an appropriate
12 and necessary part that will help Mr. Erving
13 successfully complete his term of supervised
14 release, and I'll hereby impose them.

15     $100 special assessment is imposed.

16     The $75 balance due is imposed in 20-10012.
17 There will be no supervised release in that case as
18 it's being imposed in the 22 case.

19     And I'll recommend you serve your sentence in
20 a facility -- is there a recommendation,
21 Miss Douglas?

22     MS. DOUGLAS:  Marion, Your Honor.

23     THE COURT:  Marion, Illinois, if possible, and
24 recommend you serve your sentence in a facility
25 that will allow you to maximize your exposure to

 1  educational and vocational opportunities and
 2  recommend that you be afforded the opportunity to
 3  receive the mental health assessment and any
 4  treatment as recommended and your medications that
 5  are necessary.
 6       And what is the issue with RDAP?  Do you want
 7  it recommended or not?
 8       THE DEFENDANT:  No, sir.  They -- last time
 9  they recommended it, they didn't even put us in
10  there because we was on a COVID lockdown.
11       MS. DOUGLAS:  And part of that concern there,
12  Judge -- we've talked about this.  What he's
13  telling me -- and he may be right -- the B.O.P.
14  says you have to pick RDAP or mental health, and
15  his concern is he wants to prioritize his mental
16  health.
17       THE COURT:  All right.  Now, I want to make
18  one last comment.  I wanted to leave -- I don't
19  mean this -- I wanted to leave your children out of
20  this, but these decisions you're making are now
21  making it so that more children are growing up
22  without the guidance of a father, but if you're
23  going to make the choices you make, maybe that's
24  better for them.
25       But having said that, clearly the last child

1   that you made, the one born in January was made
2   probably while you were in a halfway house.  These
3   are simply poor decisions, and they keep leading to
4   more poor decisions.

5        And the gun you picked up here was within 12
6   days after you were put on supervised release.

7        So, I don't want to say that it points --
8   paints a picture of somebody who's just likely to
9   continue to recidivate because I, frankly, think
10  after listening to you now and listening to you a
11  couple years ago you can figure out a way to move
12  away from this.  I hope you do so.

13       With that in mind, you do have appeal rights.
14  You have 14 days to do so or ask Miss Douglas to do
15  so on your behalf.

16       Good luck.

17       THE DEFENDANT:  Thank you.

18       MS. DOUGLAS:  Thank you.

19       COURTROOM DEPUTY:  Court is in recess.

20       (Proceedings concluded at 9:31 a.m.)

21

22

23

24

25

1

2

<u>CERTIFICATE OF OFFICIAL REPORTER</u>

3

4

        I, Jennifer E. Johnson, CSR, RMR, CBC, CRR,
5   in and for the United States District Court for the
    Central District of Illinois, do hereby certify
6   that pursuant to Section 753, Title 28, United
    States Code that the foregoing is a true and
7   correct transcript of the stenographically reported
    proceedings held in the above-entitled matter and
8   that the transcript page format is in conformance
    with the regulations of the Judicial Conference of
9   the United States.

10        Dated this 5th day of October, 2023.

11
                        <u>/s/ Jennifer E. Johnson</u>
12                      JENNIFER E. JOHNSON
                        CSR, RMR, CBC, CRR
13                      License #084-003039

14

15

16

17

18

19

20

21

22

23

24

25

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Central District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br>Dazmine M. Erving | ) ) ) ) ) ) ) ) ) |

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  22-CR-10033-001

USM Number:  23005-026

Jessica Douglas
_____
Defendant's Attorney

## THE DEFENDANT:

☑ pleaded guilty to count(s)  1

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☐ was found guilty on count(s) _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm | 9/14/2022 | 1 |

The defendant is sentenced as provided in pages 2 through   6   of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/6/2023
_____
Date of Imposition of Judgment       s/James E. Shadid

_____
Signature of Judge

James E. Shadid, U.S. District Judge
_____
Name and Title of Judge

September 7, 2023
_____
Date

AO 245B (Rev. 09/17)  Judgment in Criminal Case
Sheet 2 — Imprisonment

| | | | |
|---|---|---|---|
| Judgment — Page | **2** | of | **6** |

DEFENDANT:  Dazmine M. Erving
CASE NUMBER:  22-CR-10033-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

41 months to be served consecutively to the revocation sentence imposed in Central District of Illinois, Docket No. 20CR10012.

☑ The court makes the following recommendations to the Bureau of Prisons:
It is recommended that the defendant serve his sentence in a facility as close to his family as possible, specifically, USP Marion. It is further recommended that he serve his sentence in a facility that will allow him to maximize his exposure to educational and vocational opportunities. It is further recommended that the defendant be afforded the opportunity to receive a mental health assessment and any treatment recommended, as well as receive any recommended medications.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:  Dazmine M. Erving
CASE NUMBER:  22-CR-10033-001

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

3 years

      The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

1.    You must not commit another federal, state or local crime.

2.    You must not unlawfully possess a controlled substance.

3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

         ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4.    ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

      If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

      The defendant must comply with the following conditions:

1. The defendant shall not knowingly leave the federal judicial district without the permission of the court or probation officer.

2. The defendant shall report to the probation office in the district to which you are released within 72 hours of release from custody. The defendant shall report to the probation officer in a reasonable manner and frequency directed by the court or probation officer.

3. The defendant shall follow the instructions of the probation officer as they relate to the defendant's conditions of supervision. Any answers the defendant gives in response to the probation officer's inquiries as they relate to the defendant's conditions of supervision must be truthful. This condition does not prevent the defendant from invoking his Fifth Amendment privilege against self-incrimination.

4. The defendant shall notify the probation officer at least ten days prior, or as soon as knowledge is gained, to any change of residence or employment which would include both the change from one position to another as well as a change of workplace.

5. The defendant shall permit a probation officer to visit him at home or any other reasonable location between the hours of 6 a.m. and 11 p.m., unless investigating a violation or in case of emergency. The defendant shall permit confiscation of any contraband observed in plain view of the probation officer.

6. The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.

7. The defendant shall not knowingly possess a firearm, ammunition or destructive device as defined in 18 U.S.C. § 921(a)(4) or any object that you intend to use as a dangerous weapon as defined in 18 U.S.C. § 930(g)(2).

8. The defendant shall not knowingly be present at places where controlled substances are illegally sold, used, distributed, or administered.

9. The defendant shall not purchase, possess, use, distribute, or administer any controlled substance or psychoactive substances that impair physical or mental functioning except as prescribed by a physician. You shall participate in a program for substance abuse treatment as approved by the U.S. Probation Office including not more than six tests per month to determine whether you have used controlled substances. You shall abide by the rules of the treatment provider. You shall pay the costs of the treatment to the extent you are financially able to pay. The U.S. Probation Office shall determine your ability to pay and any schedule for payment, subject to the court's review upon request.

AO 245B (Rev. 09/17)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    4    of    6

DEFENDANT:  Dazmine M. Erving
CASE NUMBER:  22-CR-10033-001

## ADDITIONAL SUPERVISED RELEASE TERMS

10. The defendant shall participate in psychiatric services and/or a program of mental health counseling/treatment as approved by the U.S. Probation Office and shall take any and all prescribed medications recommended by the treatment providers. You shall pay the costs of the treatment to the extent you are financially able to pay. The U.S. Probation Office shall determine your ability to pay and any schedule for payment, subject to the court's review upon request.

11. The defendant shall attempt to secure regular and lawful employment, unless excused by the probation office for schooling, training, or other acceptable reasons. The defendant shall keep the probation officer advised of any changes in his employment status.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page <u>5</u> of <u>6</u>

DEFENDANT: Dazmine M. Erving
CASE NUMBER: 22-CR-10033-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page __6__ of __6__

DEFENDANT:  Dazmine M. Erving
CASE NUMBER:  22-CR-10033-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __100.00__  due immediately, balance due

   ☐  not later than _____ , or
   ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
   _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
   _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
   term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
   imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

✎AO 245D  (Rev. 12/03) Judgment in a Criminal Case for Revocations
Sheet 1

# UNITED STATES DISTRICT COURT

_____ Central _____  District of _____ Illinois _____

UNITED STATES OF AMERICA
### V.

Dazmine M Erving

**JUDGMENT IN A CRIMINAL CASE**
(For **Revocation** of Probation or Supervised Release)

Case Number: 20-CR-10012-001

USM Number: 23005-026

Jessica Douglas
Defendant's Attorney

## THE DEFENDANT:

☑ admitted guilt to violation of condition(s) __MC__ of the term of supervision.

☐ was found in violation of condition(s) _____ after denial of guilt.

The defendant is adjudicated guilty of these violations:

| Violation Number | Nature of Violation | Violation Ended |
|---|---|---|
| 1 | Law Violation: Felon in Possession of a Firearm | 9/14/2022 |

The defendant is sentenced as provided in pages 2 through __4__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has not violated condition(s) _____ and is discharged as to such violation(s) condition.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Last Four Digits of Defendant's Soc. Sec. No.: __7741__

Defendant's Year of Birth: __1990__

City and State of Defendant's Residence:

Peoria, Illinois

9/6/2023
Date of Imposition of Judgment

s/James E. Shadid

_____
Signature of Judge

James E. Shadid
Name of Judge

U.S. District Judge
Title of Judge

September 8, 2023
Date

A46

AO 245D    (Rev. 12/03 Judgment in a Criminal Case for Revocations
Sheet 2— Imprisonment

Judgment — Page  2  of  4

DEFENDANT:  Dazmine M Erving
CASE NUMBER:  20-CR-10012-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of :

24 months to be served consecutive to any sentence imposed in CDIL Case No. 22CR10033

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A47

1:20-cr-10012-JES-JEH   # 41   Filed: 09/08/23   Page 3 of 4
Case 1:20-cr-10012   Document: 9   Filed: 11/30/2023   Pages: 114

DEFENDANT:   Dazmine M Erving

CASE NUMBER:   20-CR-10012-001

Judgment — Page   3   of   4

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments set forth on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 75.00 | $ | $ |

☐☑ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution or a fine more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

     ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

     ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245D    (Rev. 12/03) Judgment in a Criminal Case for Revocations
Sheet 6 — Schedule of Payments

DEFENDANT:  Dazmine M Erving
CASE NUMBER:  20-CR-10012-001

Judgment — Page  4  of  4

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A    ☑  Lump sum payment of $  75.00  due immediately, balance due

☐  not later than _____ , or
☐  in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below); or

B    ☐  Payment to begin immediately (may be combined with   ☐C,   ☐ D, or   ☐ F below); or

C    ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E    ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay.

F    ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes imprisonment, payment of criminal monetary penalties is be due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.