Nos. 23-2828 and 23-2831

---

# United States Court of Appeals
## for the Seventh Circuit

DAZMINE M. ERVING,

*Appellant*,

v.

UNITED STATES OF AMERICA,

*Appellee*.

---

**On Appeal from the United States District Court for the
Central District of Illinois
Nos. 2:10-CR-10033-JES-JEH; 2:10-cr-10012-JES-JEH**

---

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, ACLU OF
ILLINOIS, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, AND
ILLINOIS ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF
DEFENDANT-APPELLANT DAZMINE ERVING AND REVERSAL OF THE
DISTRICT COURT'S ORDER**

Jonathan M. Brayman (ARDC # 6302461)
BREEN & PUGH
ILLINOIS ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS
53 W. Jackson Blvd., Suite 1550
Chicago, IL 60604
(312) 360-1001
jbrayman@breenpughlaw.com

Clifford Berlow
NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS
353 N. Clark St.
Chicago, IL 60654
(312) 840-7366
cberlow@jenner.com

Alexandra K. Block (ARDC # 6285766)
*Counsel of Record*
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740 ext. 340
ablock@aclu-il.org

Julian Clark
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
CRIMINAL LAW REFORM PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
(929) 969-4365
jclark@aclu.org

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2828 and 23-2831</u>

Short Caption: <u>Erving v. USA</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>ACLU of Illinois</u>

    _____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Roger Baldwin Foundation of ACLU, Inc.</u>

    _____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Alexandra K. Block</u>    Date: <u>November 30, 2023</u>

Attorney's Printed Name: <u>Alexandra K. Block</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address: <u>150 N. Michigan Ave., Ste. 600</u>

    <u>Chicago, IL 60601</u>

Phone Number: <u>312-201-9740</u>    Fax Number: <u>312-535-6571</u>

E-Mail Address: <u>ablock@aclu-il.org</u>

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2828 and 23-2831

Short Caption: Erving v. USA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
         American Civil Liberties Union

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
         American Civil Liberties Union Foundation

(3)      If the party, amicus or intervenor is a corporation:

         i)      Identify all its parent corporations, if any; and
                 N/A

         ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
                 N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
         N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
         N/A

Attorney's Signature: /s/ Julian Clark          Date: November 30, 2023

Attorney's Printed Name: Julian Clark

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ✔

Address: 125 Broad Street, 18th Floor

         New York, NY 10004

Phone Number: 929-969-4365          Fax Number:

E-Mail Address: jclark@aclu.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2828 and 23-2831</u>

Short Caption: <u>Erving v. USA</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Illinois Association of Criminal Defense Lawyers</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Breen & Pugh</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Jonathan M. Brayman</u>    Date: <u>November 30, 2023</u>

Attorney's Printed Name: <u>Jonathan M. Brayman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>53 W. Jackson Blvd., Ste. 1550</u>

       <u>Chicago, IL 60604</u>

Phone Number: <u>312-360-1001</u>    Fax Number: <u>312-362-9907</u>

E-Mail Address: <u>jbrayman@breenpughlaw.com</u>

rev. 12/19 AK

Save As       Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2828 and 23-2831

Short Caption: Erving v. USA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 National Association of Criminal Defense Lawyers

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Jenner & Block LLP

(3)      If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and
          N/A

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
          N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
 N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
 N/A

Attorney's Signature: /s/ Clifford Berlow          Date: November 30, 2023

Attorney's Printed Name:  Clifford Berlow

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [ ]   **No** [✔]

Address:  353 N. Clark St.

    Chicago, IL 60654-3456

Phone Number: 312-840-7366          Fax Number:  312-527-0484

E-Mail Address: cberlow@jenner.com

rev. 12/19 AK

# **Table of Contents**

Circuit Rule 26.1 Disclosure Statements ................................................................ii-v

Table of Contents ...................................................................................................... vi

Table of Authorities...............................................................................................vii-xi

Interest of Amici Curiae............................................................................................ 1

Statement Pursuant to Fed. R. Civ. P. 29(a)(4)(E) ................................................ 2

Summary of the Argument........................................................................................ 3

Argument ................................................................................................................... 4

    A.    Introduction................................................................................................ 4

    B.    Disproportionate Enforcement of Cannabis Laws Harms Black and Latino People........... 5

    C.    Police Stop and Search Drivers of Color at Disproportionately High Rates Nationwide and in Illinois ............................................................................ 7

    D.    Pretextual Traffic Stops Increase the Likelihood of Racial Profiling .............................. 13

    E.    The Harms of Pretextual Traffic Stops and Vehicle Searches, Including Those Based on the Alleged Odor of Cannabis Alone, Greatly Outweigh Any Perceived Benefits...... 18

    F.    Pretextual Stops and Searches Based on the Alleged Odor of Cannabis Alone are Insulated from Judicial Scrutiny, Preventing Review of Baseless Police Actions .......... 19

Conclusion ................................................................................................................ 21

Certificate of Compliance with Word Limit, Typeface Requirements, and Type-Style Requirements .....................................................................................22

Certificate of Service ...............................................................................................23

## Table of Authorities

**CASES**

*Draper v. United States*, 358 U.S. 307 (1959) ...................................................... 20

*Illinois v. Caballes*, 543 U.S. 405 (2005) ............................................................. 14

*People v. Hill*, 162 N.E.3d 260 (Ill. 2020) ............................................................. 7

*People v. Molina*, No. 20-TR-5612 (Ill. Cir. Ct. 2021) ......................................... 7

*King v. City of Chicago*, 22-cv-04604 (N.D. Ill. Jul. 11, 2023) .......................... 12

*State v. Pedro Soto*, 734 A.2d 350 (N.J. Sup. Ct. 1996) ......................................... 8

*Whren v. United States*, 517 U.S. 806 (1996) ...................................................... 13

*Wilkins v. Maryland State Police*, Civ. No. MJG-93-468 (D. Md. 1993) ................ 8

**STATUTES**

625 ILCS 5/11-212 .................................................................................................. 8

Ill. P.A. 101-24 ........................................................................................................ 11

Ill. P.A. 94-997 ....................................................................................................... 10

Ill. P.A. 95-290 ....................................................................................................... 10

Ill. P.A. 96-658 ....................................................................................................... 10

Ill. P.A. 97-469 ....................................................................................................... 10

Ill. P.A. 98-686 ....................................................................................................... 10

**OTHER AUTHORITIES**

*A New Vehicle for "Stop and Frisk": The Scope, Impact, and Inequities of Traffic Stops in Chicago*, BPI & FREE 2 MOVE 26 (Mar. 2023), https://www.impactforequity.org/wp-content/uploads/2023/05/BPI_Traffic-Stop-Report_F.pdf ....................................... 18

*A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform*, ACLU (2020), https://www.aclu.org/report/tale-two-countries-racially-targeted-arrests-era-marijuana-reform ....................................................................................................... 6, 7

ACLU-IL, *Racial Disparity in Consent Searches and Dog Sniff Searches*, (Aug. 13, 2014), https://perma.cc/P6CC-832K ............................................................................... 10

ACLU-IL, *Racism in the Rear-view Mirror: Illinois Traffic Stop Data 2015-2017* (Jan. 3, 2019), https://www.aclu-il.org/sites/default/files/racism_in_the_rear_view_mirror_il_traffic_stops_2015-2017.pdf ................................................................................................................ 8, 10

Alex Kreit, *Marijuana Legalization and Pretextual Stops*, 50 U.C.D. L. REV. 741 (2016)... 14, 15

Amanda Geller, Jeffrey Fagan, Tom Tyler, and Bruce G. Link, *Aggressive Policing and the Mental Health of Young Urban Men*, AM. J. PUB. HEALTH 104, no. 12 (2014) https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2014.302046 ................................. 17

Amber Landers, David Rollock, Charity Rolfes, and Demietrice Moore, *Police Contacts and Stress among African American College Students*, AM. J. ORTHOPSYCHIATRY 81, no. 1 (2011) https://psycnet.apa.org/doiLanding?doi=10.1111%2Fj.1939- 0025.2010.01073.x ................. 17

*An Assessment of Traffic Stops and Policing Strategies in Nashville*, POLICING PROJECT 10 (2018), https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5bf2d18d56 2fa747a554f6b0/1542640014294/Policing+Project+Nashville+Report.pdf ..................... 18, 19

Andrew Ferguson, *Policing Predictive Policing*, 94 WASH. U. L. REV. 1109 (2017) ................. 14

Bernard E. Harcourt & Tracey L. Meares, *Randomization and the Fourth Amendment*, 78 U. CHI. L. REV. 809 (2011) ................................................................................................................. 8

Charles R. Epp, Steven Maynard-Moody & Donald Haider-Markel, PULLED OVER: HOW POLICE STOPS DEFINE RACE AND CITIZENSHIP (2014) ........................................................ 8, 13, 14, 16

Chris Horn, *Racial Disparities Revealed in Massive Traffic Stop Dataset*, UNIV. S.C. (June 12, 2020), https://www.sc.edu/uofsc/posts/2020/06/racial_disparities_traffic_stops.php#. Y96Cc3bMI2y ....................................................................................................................... 16

CIV. RTS. CIV. RTS. DIV., *Investigation of the Chicago Police Department*, U.S. DEP'T OF JUSTICE 142 (Jan. 13, 2017) ................................................................................................................. 8

Claire J. Rice, *Failing the Sniff Test: Using Marijuana Odor to Establish Probable Cause in Illinois Post-Legalization*, U. CHI. L. REV. ONLINE (Sept. 23, 2022), https://lawreviewblog.uchicago.edu/2022/09/23/rice-probable-cause ...................................... 10

*Contacts Between Police and the Public, 2020*, DEPT. OF JUSTICE BUREAU OF JUSTICE STATISTICS (Nov. 2022), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/cbpp20.pdf ..... 7

David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Stops*, 87 J. CRIM. L. & CRIMINOLOGY 544 (1997) .......................................... 13, 15

David A. Harris, *Driving While Black: Racial Profiling on Our Nation's Highways*, ACLU (1999), https://www.aclu.org/report/driving-while-black-racial-profiling-our-nations-highways [https://perma.cc/HMK5-JUSK] ................................................................................................ 15

David A. Harris, PROFILES IN INJUSTICE (2003)...........................................................................8

David D. Kirkpatrick, et al., *Why Many Police Traffic Stops Turn Deadly*, N.Y. TIMES (Nov. 30, 2021), https://www.nytimes.com/2021/10/31/us/police-traffic-stops-killings.html?smid=nytcore-ios-share&referringSource=articleShare .....................................17

David Rudovsky, *Law Enforcement by Stereotypes and Serendipity: Racial Profiling and Stops and Searches Without Probable Cause*, 3 U. PA. J. CONST. L. 296 (2001)..............................15

David Rudovsky, *The Impact of the War on Drugs on Procedural Fairness and Racial Equality*, 1994 U. CHI. LEGAL F. 237 ..............................................................................................14

Emma Pierson et al., *A Large-scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 NATURE HUMAN BEHAVIOUR 736 (2020), https://5harad.com/papers/100M-stops.pdf ......................................................................................................................8

*Fines and Fees*, VERA, https://www.vera.org/ending-mass-incarceration/criminalization-racial-disparities/fines-and-fees (last visited Nov. 21, 2023) .............................................16

Gary Webb, *Driving While Black: Tracking Unspoken Law-Enforcement Racism*, ESQUIRE (Apr. 1, 1999)...........................................................................................................15

*Illinois State Police CRIMPAT/ Valkyrie Training*, 39 ILL. STATE POLICE (2013), https://www.aclu-il.org/sites/default/files/criminal_patrol_core_1.pdf .............................14, 18

*Illinois Traffic and Pedestrian Stop Study 2004 Annual Report: Traffic Stops*, ILL. DEP'T TRANSP., https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/2004-illinois-traffic-stop-study.pdf (last visited Nov. 21, 2023)...............................................................................................................9

*Illinois Traffic and Pedestrian Stop Study 2006 Annual Report: Traffic Stops*, ILL. DEP'T TRANSP., https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/2006-illinois-traffic-stop-study-statewide-report.pdf (last visited Nov. 21, 2023) ........................................................................................9

*Investigation of the City of Minneapolis and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE 32 (June 16, 2023) .......................................................................................8

J.L. Hirschtick, S.M. Homan, G. Rauscher, et al., *Persistent and Aggressive Interactions with the Police: Potential Mental Health Implications*, EPIDEMIOLOGY AND PSYCHIATRIC SCIS. 29 (2020), e19, https://www.cambridge.org/core/journals/epidemiology-and-psychiatric-sciences/article/persistent-and-aggressive-interactions-with-the-police-potential-mental-health-implications/08A72C424643BA06BF558E579CC30312 ....................................17

Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 STAN. L. & POL'Y REV. 257 (2009) .................................................................................................... 5

John Hudak, *Marijuana's Racist History Shows the Need for Comprehensive Drug Reform*, BROOKINGS INST. (June 23, 2020), https://www.brookings.edu/articles/marijuanas-racist-history-shows-the-need-for-comprehensive-drug-reform ........................................................ 6

John MacDonald, Jeffrey Fagan, & Amanda Geller, *The Effects of Local Police Surges on Crime and Arrests in New York City*, PLOS ONE (June 16, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2614058 ............................................... 18

Jordan Blair Woods, *Traffic Without the Police*, 73 STAN. L. REV. 1471 (2021) .......................... 13

Magnus Lofstrom, et al., *Racial Disparities in Law Enforcement Stops*, PUB. POLICY INST. CAL. (Oct. 2021), https://www.ppic.org/?show-pdf=true&docraptor=true&url=https%3A%2F%2F www.ppic.org%2Fpublication%2Fracial-disparities-in-law-enforcement-stops%2F .............. 16

*Marijuana Arrests by the Numbers*, ACLU, https://www.aclu.org/gallery/marijuana-arrests-numbers (last visited Nov. 21, 2023) ............................................................................................ 5

Nayak Polissar et al., *Illinois Traffic and Pedestrian Stop Study 2022 Annual Report: Traffic Stops*, ILL. DEP'T TRANSP. 2 (June 30, 2023), https://idot.illinois.gov/content/dam/soi/en /web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/final--il-stop-study-2022-part-ii-traffic-stops--6-30-23.pdf ........................................................10, 11, 12, 13

Peter Vernierio & Paul H. Zoubek, INTERIM REPORT OF THE STATE POLICE REVIEW TEAM REGARDING ALLEGATIONS OF RACIAL PROFILING (1999), https://www.state.nj.us/lps/ intm_419.pdf [https://perma.cc/5T8Y-25PG] ....................................................................... 15

*Racial Disparities in Stops by the D.C. Metropolitan Police Department: Review of Five Months of Data*, ACLU-DC AND ACLU ANALYTICS (June 16, 2020), https://perma.cc/N4B8- AA86. 19

Rashida Richardson, *Racial Segregation and the Data-driven Society: How Our Failure to Reckon with Root Causes Perpetuates Separate and Unequal Realities*, 36 BERK. TECH. L.J. 1051 (2021) ............................................................................................................................... 14

*Report on Race- and Ethnicity-based Disparities in the Chicago Police Department's Use of Force*, CITY OF CHI. INSPECTOR GEN. 32 (Mar. 1, 2022), https://igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf......................................... 14, 17

Sharon LaFraniere & Andrew W. Lehren, *The Disproportionate Risks of Driving While Black*, N.Y. TIMES (Oct. 24, 2015) ................................................................................................... 8

Silvia S. Martins, Luis E. Segura, Natalie S. Levy et al., *Racial and Ethnic Differences in Cannabis Use Following Legalization in U.S. States with Medical Cannabis Laws*, 2021 JAMA NETWORK OPEN 1, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2784528 ................................................................................................................ 6

Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Traffic Stops and Racial Profiling*, 73 STAN. L. REV. 637 (2021) ...................................................................... 13

*The Truth About Trials*, MARSHALL PROJECT, https://www.themarshallproject.org/2020/11/04/the-truth-about-trials (last visited Nov. 21, 2023) .............................................................. 20

*The War on Marijuana in Black and White*, ACLU 21 (2013), https://www.aclu.org/report/report-war-marijuana-black-and-white ........................................................................................ 6

William Cai, Johann Gaebler, Justin Kaashoek, Lisa Pinals, Samuel Madden & Sharad Goel, *Measuring Racial and Ethnic Disparities in Traffic Enforcement with Large-scale Telematics Data*, 2022 PNAS NEXUS 1, https://academic.oup.com/pnasnexus/article/1/4/pgac144/6652221 ............................................................................................................................ 8

**Interest of Amici Curiae**

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in our nation's Constitution and civil rights laws. The ACLU's Criminal Law Reform Project ("ACLU-CLRP") engages in litigation and advocacy throughout the country to protect the constitutional and civil rights of criminal defendants and end harsh crime policies that result in mass incarceration and criminalization.

The ACLU of Illinois ("ACLU-IL") is the state-wide Illinois affiliate of the ACLU. ACLU-IL is a private, nonprofit, nonpartisan organization supported by a membership of approximately 50,000 individuals. Its purpose is to protect the rights and liberties guaranteed to all Illinoisans by the United States and Illinois Constitutions. Among these rights are the right to be free from unreasonable searches and seizures, and the right to be free from unlawful discrimination on the basis of race and national origin, both of which are central to the legal question raised in this case.

The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958. It has a nationwide membership of approximately 10,000 lawyers, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus

assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal legal system as a whole.

The Illinois Association of Criminal Defense Lawyers ("IACDL") is a nonprofit organization dedicated to defending the rights of all individuals as guaranteed by the United States Constitution and the Constitution of the State of Illinois. The organization's membership includes private criminal defense attorneys, public defenders, and law professors throughout the State of Illinois. The IACDL's mission is to serve as a leader, alongside diverse coalitions, in identifying and reforming flaws and inequities in the criminal legal system, redressing systemic racism, and ensuring its members and others in the criminal defense bar are fully equipped to serve all accused persons at the highest level. IACDL is committed to enhancing the criminal defense bar's capacity to safeguard fundamental constitutional rights. It is an affiliate organization of the National Association of Criminal Defense Lawyers.

Amici submit this brief urging the United States Court of Appeals for the Seventh Circuit to reverse the District Court's denial of the motion to suppress and find that the mere odor of burnt cannabis alone is insufficient as a basis for probable cause to search a vehicle pursuant to the automobile exception to the warrant requirement of Fourth Amendment of the U.S. Constitution.

## **Statement Pursuant to Fed. R. Civ. P. 29(a)(4)(E)**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) amici represent that:

(i)     No party's counsel authored this brief in whole or in part;

(ii)    No party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii)   No person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparation or submission of this brief.

## Summary of the Argument

*Amici* urge the Court to hold that the odor of burnt cannabis—the possession and use of which is often legal under state law—does not alone provide a legally sufficient basis for police officers to search a vehicle pursuant to the motor vehicle exception to the Fourth Amendment's warrant requirement. Such vehicle searches, typically following pretextual traffic stops, disproportionately burden Black and Latino drivers, who are likewise targeted for disparate enforcement of cannabis laws. The better policy, which will begin to remedy a long history and ongoing pattern of racially discriminatory law enforcement, is to not allow officers to utilize what may be lawful behavior as an excuse to detain and search drivers—a disproportionate number of whom inevitably will be drivers of color.

Statistics show that police disproportionately target Black and Latino people for enforcement of cannabis laws, both in Illinois and throughout the United States. Data further establish that police in Peoria (where Defendant-Appellant Dazmine Erving's vehicle was searched), in Illinois, and nationwide, pull over and search Black and Latino motorists at disproportionately high rates. Pretextual traffic stops—those conducted for investigatory purposes and not for roadway safety—are a primary policing tool that drives these racial and ethnic disparities. The alleged odor of cannabis is one of the most common pretexts that police use for stopping and searching drivers, especially drivers of color. This is true despite the fact that white people and people of color tend to use and possess cannabis at similar rates.

Giving officers *carte blanche* to perform warrantless vehicle searches based only on the alleged odor of cannabis will judicially sanction the unacceptable racial and ethnic disparities among the drivers whom police officers stop and search. When police can conduct warrantless searches based on the alleged, unverifiable odor of cannabis without anything more, history and

experience show that police will use that authority to disproportionately target and harm Black and Latino drivers.

In a state such as Illinois, where possession of certain amounts of cannabis is legally permitted, police must not be able to conduct a search or seizure based upon the odor of cannabis alone. To the extent that the Government continues to rely on the alleged odor of cannabis to justify the search of Mr. Erving's vehicle, *amici* urge this Court to reverse the District Court's denial of Mr. Erving's motion to suppress.

## Argument

### A. Introduction

A police lieutenant in Peoria, Illinois, observed Mr. Erving's car parked in an otherwise-vacant parking lot of a public park shortly before 3:00 A.M on September 14, 2022. The lieutenant shined his spotlight and a handheld flashlight into the car and observed Mr. Erving and a female in the back seat, with Mr. Erving partially undressed. Nobody was in the driver's seat. The car was not running. The officer claimed he saw Mr. Erving make a quick bending motion when he approached, and that this motion formed the entire basis for his belief that he had probable cause to search the vehicle after ordering Mr. Erving and the passenger out of the back seat. Upon searching the car, the officer found a firearm beneath the driver's seat.

The officer testified at the suppression hearing that Mr. Erving was cooperative throughout the encounter. He had no concern about impaired driving and did not conduct a field sobriety test. His search of the vehicle yielded no cannabis or drug paraphernalia. Nonetheless, he later wrote in his report that he believed he smelled an odor of burnt cannabis when Mr. Erving first opened the back door of the car. The lieutenant made no mention of an odor of cannabis or marijuana on the body camera footage tendered to the District Court, however.

The Government contended below that the officer lawfully searched Mr. Erving's car based in part on the alleged odor of cannabis detected by the police officer. The District Court declined to rule on this issue, instead holding that the lieutenant's search was a valid "protective sweep" for purposes of officer safety.

To the extent that this Court is inclined to address the question of whether the alleged odor of cannabis alone is a sufficient basis for a warrantless vehicle search, *amici* urge this Court to answer the question in the negative to protect the people of Illinois from the racially-biased misuse of vehicle stops and searches by police. There is a decades' long pattern of police in this state using pretext like cannabis odor to disproportionately stop and search Black and Latino drivers, leading to tremendous harm for people of color in the name of seizing contraband that police rarely, if ever, actually find. A holding by this Court that the alleged odor of cannabis alone provided sufficient cause to search the vehicle in this case will only exacerbate these inequities.

## B. Disproportionate Enforcement of Cannabis Laws Harms Black and Latino People

For decades, police departments across the United States have disproportionately targeted Black and Latino individuals for investigation and enforcement of cannabis-related conduct.[1] Although Black people account for roughly 13% of the United States population, they are nearly four times more likely than white people to be arrested for a cannabis-related offense.[2] While the national arrest rate of white people for cannabis-related conduct remained largely constant for the

---

[1] Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 STAN. L. & POL'Y REV. 257, 272–3 (2009) (reviewing drug arrest rates by race from 1980 to 2007).

[2] *Marijuana Arrests by the Numbers*, ACLU, https://www.aclu.org/gallery/marijuana-arrests-numbers (last visited Nov. 21, 2023).

first decade of the millennium, the arrest rate for Black people steadily *increased* between 2002 and 2010.[3]  Over the last decade, as more states have decriminalized and/or legalized possession and consumption of cannabis, the arrest rate disparity between white and Black individuals has remained largely constant—including in states that have adopted legalization measures.[4]

Notably, the police targeting of Black and Latino people in this way cannot be justified or excused on the basis of actual drug usage and possession.  Researchers have consistently found that cannabis usage rates are similar between white and non-white individuals,[5] and some studies posit that white people possess and use cannabis at higher rates than Black people.[6]  Yet, as stated above, across the nation police still arrest Black people for cannabis-related offenses at four times the rate of white individuals.[7]  And in Illinois, the racial disparities are among the worst in the country—Black people are more than seven times more likely to be arrested for cannabis

---

[3] *The War on Marijuana in Black and White*, ACLU 21 (2013), https://www.aclu.org/report/report-war-marijuana-black-and-white.

[4] *A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform*, ACLU (2020), https://www.aclu.org/report/tale-two-countries-racially-targeted-arrests-era-marijuana-reform.

[5] ACLU, *supra* note 3, at 66.

[6] *See, e.g.*, Silvia S. Martins, Luis E. Segura, Natalie S. Levy et al., *Racial and Ethnic Differences in Cannabis Use Following Legalization in U.S. States with Medical Cannabis Laws*, 2021 JAMA NETWORK OPEN 1, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2784528 ("in 2018 the lifetime prevalence of cannabis use was lower for Black (45.3%) than White (53.6%) adults aged 18 years or older, but Black individuals were 3.64 times more likely to be arrested for cannabis possession."); ACLU, *supra* note 3, at 21 ("In 2010, 34% of whites and 27% of Blacks reported having last used marijuana more than one year ago—a constant trend over the past decade. In the same year, 59% of Blacks and 54% of whites reported having never used marijuana. Each year over the past decade more Blacks than whites reported that they had never used marijuana.").

[7] ACLU, *supra* note 3, at 17; *see also* John Hudak, *Marijuana's Racist History Shows the Need for Comprehensive Drug Reform*, BROOKINGS INST. (June 23, 2020), https://www.brookings.edu/articles/marijuanas-racist-history-shows-the-need-for-comprehensive-drug-reform.

possession than white people.[8]   Thus, while the criminal legal system casts a wide net over cannabis use and possession by Black individuals in America, it has effectively ignored the same conduct occurring at the same *or greater* rates in many white communities.   This significant inequity is especially problematic in light of the fact that many of the people arrested may have engaged in entirely lawful behavior.[9]

### C. Police Stop and Search Drivers of Color at Disproportionately High Rates Nationwide and in Illinois

Many of the historical and present racial and ethnic disparities in cannabis-related enforcement by police arise out of systemic disparities in police stops and investigations, including traffic stops.

In 2020, the traffic stop was the most common type of police-initiated contact with U.S. residents age sixteen or older, with more than twenty-one million such encounters that year.[10]   An extensive body of literature has long made clear that police do not stop or investigate all

---

[8] ACLU, *supra* note 4, at 8.

[9] A person may smell of burnt or raw cannabis for a host of innocent reasons.   "[O]ne such reason is that a person working at a cannabis cultivation facility, or a dispensary could, and likely would, leave their place of employment smelling like raw cannabis.   Persons with medical cannabis card may cultivate plants and, in the process of doing so, would likely smell of raw cannabis.   Persons using or handling raw cannabis in *any way* can smell of raw cannabis.   Persons using, possessing, or otherwise around raw cannabis wholly within the bounds of the law can, and likely will, have the odor of cannabis on their clothes, hair, and even personal effects."   *People v. Molina*, No. 20-TR-5612 (Ill. Cir. Ct. 2021).   Like the odor of raw cannabis, the diffuse and lasting odor of burnt cannabis may derive entirely from legally purchased and lawfully-consumed cannabis, whether marijuana or hemp-derived cannabidiol ("CBD") cigarettes.   *See, e.g.*, *People v. Hill*, 162 N.E.3d 260, 266 (Ill. 2020) (explaining courts assessing probable cause must consider "the plausibility of an innocent explanation").

[10] *Contacts Between Police and the Public, 2020*, DEPT. OF JUSTICE BUREAU OF JUSTICE STATISTICS (Nov. 2022),   https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/cbpp20.pdf   (publishing data that showed 16,709,200 drivers and 4,918,700 passengers had contact with police during a traffic stop in 2020).

community members equally.[11]  Racial and ethnic disparities in traffic stops have persisted for decades,[12] despite evidence indicating that white drivers commit moving violations at equal or higher rates than other racial groups.[13]

In Illinois, data collected on traffic stops over the last two decades shows prolific, persistent, and severe racial and ethnic disparities in traffic stops and searches.  This trend includes Peoria, where Mr. Erving was stopped and searched.  In 2003, concerned about decades of reports regarding biased traffic stops, the Illinois General Assembly passed Public Act 93-0209 ("the Study Act") to study racial discrimination in traffic stops.  *See* 625 ILCS 5/11-212.  The Study Act required all law enforcement agencies in Illinois to collect and report uniform demographic data on each traffic stop they conducted for three and a half years.  In 2005, the first annual report issued

---

[11] *See, e.g.*, Charles R. Epp, Steven Maynard-Moody & Donald Haider-Markel, PULLED OVER: HOW POLICE STOPS DEFINE RACE AND CITIZENSHIP (2014); Bernard E. Harcourt & Tracey L. Meares, *Randomization and the Fourth Amendment*, 78 U. CHI. L. REV. 809, 854–59 (2011) (citing numerous studies providing evidence of racial profiling); Emma Pierson et al., *A Large-scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 NATURE HUMAN BEHAVIOUR 736 (2020), https://5harad.com/papers/100M-stops.pdf; ACLU-IL, *Racism in the Rear-view Mirror: Illinois Traffic Stop Data 2015-2017* (Jan. 3, 2019), https://www.aclu-il.org/sites/default/files/racism_in_the_rear_view_mirror_il_traffic_stops_2015-2017.pdf; Sharon LaFraniere & Andrew W. Lehren, *The Disproportionate Risks of Driving While Black*, N.Y. TIMES (Oct. 24, 2015); CIV. RTS. CIV. RTS. DIV., *Investigation of the Chicago Police Department*, U.S. DEP'T OF JUSTICE 142 (Jan. 13, 2017) (finding that the Chicago Police Department disproportionately targeted Black and Latino individuals for stops); *Investigation of the City of Minneapolis and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE 32 (June 16, 2023) (finding that the Minneapolis Police Department disproportionately targets Black and Native American individuals for traffic and pedestrian stops).

[12] In the 1990s, for example, litigation in New Jersey and Maryland provided irrefutable statistical evidence of racial profiling in traffic stops.  David A. Harris, PROFILES IN INJUSTICE 60–62 (2003) (discussing lawsuits in New Jersey, *State v. Pedro Soto*, 734 A.2d 350 (N.J. Sup. Ct. 1996), and Maryland, *Wilkins v. Maryland State Police*, Civ. No. MJG-93-468 (D. Md. 1993)).

[13] *See* William Cai, Johann Gaebler, Justin Kaashoek, Lisa Pinals, Samuel Madden & Sharad Goel, *Measuring Racial and Ethnic Disparities in Traffic Enforcement with Large-scale Telematics Data*, 2022 PNAS NEXUS 1, https://academic.oup.com/pnasnexus/article/1/4/pgac144/6652221.

by the Illinois Department of Transportation ("IDOT") pursuant to the Study Act confirmed what many community members had already known and experienced for decades: police in Illinois were more likely to pull over drivers of color (defined as Black, Latino, Asian, and Native American drivers) than white drivers, and they were two and a half times more likely to search vehicles driven by people of color.[14]

Subsequent annual reports issued by IDOT pursuant to the Study Act revealed that the racial and ethnic disparities in Illinois traffic stops were not an anomaly but a fixture of policing in Illinois. By 2006, the year the data collection law was originally set to expire, the disparities had *worsened* compared to 2004. Statewide, Illinois police were still more likely to stop Black drivers than white drivers, and they were three times more likely to attempt searches of Black drivers compared to white drivers.[15] More troubling, IDOT found that although drivers of color were two and a half times more likely to be asked by police for a search of their vehicle, police in Illinois found contraband in vehicles driven by people of color at *half* the rate they did for white drivers.[16] These disparities show that police apply lower thresholds of suspicion to search people of color compared to white people.

---

[14] *See Illinois Traffic and Pedestrian Stop Study 2004 Annual Report: Traffic Stops*, ILL. DEP'T TRANSP., https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/2004-illinois-traffic-stop-study.pdf (last visited Nov. 21, 2023).

[15] *See Illinois Traffic and Pedestrian Stop Study 2006 Annual Report: Traffic Stops*, ILL. DEP'T TRANSP., https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/2006-illinois-traffic-stop-study-statewide-report.pdf (last visited Nov. 21, 2023).

[16] *See id.*

The Illinois legislature extended and amended the Study Act several times. *See* Ill. P.A. 94-997; Ill. P.A. 95-290; Ill. P.A. 96-658; Ill. P.A. 98-686. Then in 2012, concerned about racial disparities in the use of police canines, Illinois began requiring law enforcement agencies to report data on sniffs by police dogs during traffic stops. Ill. P.A. 97-469. The first year of data on dog sniffs revealed that, statewide, Black motorists were 55% more likely to be subjected to a dog sniff by police, even though police were 14% more likely to find contraband during searches performed in response to a dog alert with a white motorist[17]—disparities which continue to this day and continue to show that police officers stereotype Black drivers as more suspicious.[18]

In 2019, the ACLU-IL released a report documenting continued racial and ethnic disparities in Illinois traffic stops and searches.[19] The report found that stop disparities statewide increased every year from 2015–2017, and that Black and Latino drivers continued to be searched at higher rates than white drivers. By 2019—a decade and a half after the Study Act was first adopted— racial and ethnic disparities in Illinois traffic stops and searches were so persistent that the Illinois

---

[17] ACLU-IL, *Racial Disparity in Consent Searches and Dog Sniff Searches*, (Aug. 13, 2014), https://perma.cc/P6CC-832K.

[18] *See* Nayak Polissar et al., *Illinois Traffic and Pedestrian Stop Study 2022 Annual Report: Traffic Stops*, ILL. DEP'T TRANSP. 2 (June 30, 2023), https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/final--il-stop-study-2022-part-ii-traffic-stops--6-30-23.pdf (showing that Black drivers in Illinois in 2022 were subjected to dog sniffs disproportionately relative to their share of the estimated driving population, while white drivers were subjected to lower rates of dog sniffs relative to their share of the population and despite dog sniffs having a higher positive alert rate for white drivers compared to Black drivers); *see also* Claire J. Rice, *Failing the Sniff Test: Using Marijuana Odor to Establish Probable Cause in Illinois Post-Legalization*, U. CHI. L. REV. ONLINE (Sept. 23, 2022), https://lawreviewblog.uchicago.edu/2022/09/23/rice-probable-cause ("Experts suggest that canines often make mistakes by reacting to unconscious cues from their handlers who themselves may exhibit implicit or explicit racial bias.").

[19] ACLU-IL, *Racism in the Rear-view Mirror: Illinois Traffic Stop Data 2015-2017*, https://www.aclu-il.org/sites/default/files/racism_in_the_rear_view_mirror_il_traffic_stops_2015-2017.pdf (last visited Nov. 21, 2023).

General Assembly made the data collection requirement under the Study Act permanent.  Ill. P.A. 101-24.

Today, law enforcement agencies across Illinois continue to engage in discriminatory traffic stop and search practices.  The racial and ethnic disparities are often worst in densely populated areas where there are more diverse demographics.  In 2022, each of Illinois' ten largest cities by population—together accounting for nearly one-third of the state's total population—reported severe racial and ethnic disparities in traffic stops and searches.[20]

In Peoria, the racial and ethnic disparities associated with traffic stops are among the worst in the state.  Last year, the Peoria Police Department stopped Black drivers at *six times* the rate of white drivers.  Police stopped Latino drivers at 1.7 times the rate of white drivers relative to each group's share of the estimated driving population.[21]  Police in Peoria searched nearly one-fifth (17%) of all stopped vehicles driven by Black drivers—almost *three times* the rate of those driven by white drivers.[22]

These numbers are similar throughout larger metropolitan areas in Illinois.  In Aurora, Urbana, Champaign, Springfield, and Naperville, Black drivers were between three and nine times more likely to be stopped by police than white drivers in 2022.[23]  In Chicago, police in 2022 were nearly four times more likely to stop Black drivers and more than twice as likely to stop Latino

---

[20] *See* Polissar et al., *supra* note 18.

[21] *See id.* at 997.

[22] *See id.* at 997–98.

[23] *See id.* at 47, 190, 875, 1183, 1266.

drivers relative to each group's share of the estimated driving population.[24]  Chicago police also subjected Black drivers to vehicle searches during traffic stops at a rate four and a half times greater than white drivers, and searched Latino drivers at three times the rate of white drivers, although the police were significantly *less* likely (or, in the case of Latino drivers, equally as likely) to find contraband in vehicles driven by Black drivers.  One federal court has found plausible evidence to believe that the Chicago Police Department "maintained a policy that disproportionately targeted motorists based on race."[25]

Black and Latino motorists in rural and less racially-diverse areas of Illinois likewise suffer from police targeting them for traffic stops and searches.  Last year in Kankakee, for example, police stopped Black drivers at more than three times the rate of white drivers, and Latino drivers at more than twice the rate relative to each group's share of the estimated driving population.[26] Police in Kankakee subjected Black drivers to vehicle searches at nearly double the rate of white drivers, yet found contraband in vehicles driven by Black drivers at a lower rate compared to those driven by white drivers.[27]

In Watseka, a small town of 5,000 people that is 97% white, officers last year searched the vehicle of *every single Black person they pulled over*.[28]  In Rockton, a village of 7,800 that is 92%

---

[24] *See id.* at 206–07.

[25] *See King v. City of Chicago*, 22-cv-04604, at 11 (N.D. Ill. Jul. 11, 2023), ECF No. 59 (denying motion to dismiss).

[26] *See* Polissar et al., *supra* note 18, at 631–32.

[27] *Id.*

[28] *See id.* at 1298–99.

white, police in 2022 stopped Black drivers at more than twice the rate of white drivers, searched Black drivers and their vehicles at more than twice the rate of white drivers, and yet they found contraband significantly *less* often compared to white drivers.[29]

### D. Pretextual Traffic Stops Increase the Likelihood of Racial Profiling

Racial and ethnic disparities in traffic stops often worsen when police use traffic stops to enforce laws other than those related to traffic safety.[30]  Commonly referred to as "pretextual stops," these are stops ostensibly based on an observed traffic infraction or equipment violation, but they are conducted with the ulterior motive of investigating unrelated criminal activity for which the officer has no or insufficient individualized suspicion.  Though these stops do not violate the Fourth Amendment as long as there is probable cause of the traffic violation, *Whren v. United States*, 517 U.S. 806, 819 (1996), pretextual stops give the police nearly unlimited discretion in deciding whom to stop for investigative purposes.  With traffic laws that are so elaborate, so detailed, and so unrealistic,[31] virtually "no driver can avoid violating some traffic law during a short drive, even with the most careful attention."[32] Pretextual stops increased in popularity among

---

[29] *See id.* at 1081–82.

[30] *See, e.g.*, Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Traffic Stops and Racial Profiling*, 73 STAN. L. REV. 637 (2021); Epp et al., *supra* note 11, at 10.

[31] Jordan Blair Woods, *Traffic Without the Police*, 73 STAN. L. REV. 1471, 1480–81 (2021).

[32] David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Stops*, 87 J. CRIM. L. & CRIMINOLOGY 544, 545 (1997).

police nationwide at the inception of the War on Drugs,[33] and remain a favored tactic by police to allegedly interdict drugs and other contraband.[34] Illinois is no exception.[35]

In major jurisdictions known to rely heavily on pretextual traffic stops as a supposed crime-fighting tactic, the racial and ethnic makeup of a given geographic area is often a greater predictor of where police make pretextual stops than the rate of crime itself.[36] Even where traffic stops do match neatly onto "hot spots" of crime, the crime rates and data used by police is skewed by the historic over-policing of Black and brown communities, resulting in increased, disproportionate targeting of Black, Latino, and Indigenous people with pretextual stops.[37]

---

[33] Alex Kreit, *Marijuana Legalization and Pretextual Stops*, 50 U.C.D. L. REV. 741, 743–44 (2016); David Rudovsky, *The Impact of the War on Drugs on Procedural Fairness and Racial Equality*, 1994 U. CHI. LEGAL F. 237, 249.

[34] Epp et al., *supra* note 11, at 59.

[35] *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405 (2005); *see also Illinois State Police CRIMPAT/ Valkyrie Training*, 39 ILL. STATE POLICE (2013), https://www.aclu-il.org/sites/default/files/criminal_patrol_core_1.pdf (encouraging Illinois State Police to engage in "highly visible traffic operations" as a "proactive style of policing" with the goals of allegedly addressing "violent crime, traffic safety, drug crimes.").

[36] *See, e.g.*, *Report on Race- and Ethnicity-based Disparities in the Chicago Police Department's Use of Force*, CITY OF CHI. INSPECTOR GEN. 32 (Mar. 1, 2022), https://igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf (finding that Chicago police traffic stops are more highly concentrated in areas where the majority of the population is Black than in areas the police classify as higher crime areas).

[37] *See, e.g.*, Rashida Richardson, *Racial Segregation and the Data-driven Society: How Our Failure to Reckon with Root Causes Perpetuates Separate and Unequal Realities*, 36 BERK. TECH. L.J. 1051 (2021); Andrew Ferguson, *Policing Predictive Policing*, 94 WASH. U. L. REV. 1109, 1146–47 (2017).

When making pretextual stops, police rely largely on intuition[38] to decide which cars to pull over and investigate.[39]  Extensive evidence shows that officers use this "intuition" to target drivers of color more often than white drivers.[40]  Unable to reliably distinguish the cars that may contain drugs or evidence of other crimes, a driver's race or ethnicity, whether consciously or unconsciously, factors into an officer's suspicions of who may possess contraband and, therefore, who should be stopped and investigated.[41]

The story of racial disparity in traffic stops is similar across the country.  One study of traffic stops in Kansas City separated stops for minor violations done for purposes of investigation from stops for more significant traffic violations, where the purpose of the stop was to enforce the traffic laws.  The results showed that Black people were twice as likely as white people to be

---

[38] *E.g.*, Gary Webb, *Driving While Black: Tracking Unspoken Law-Enforcement Racism*, ESQUIRE (Apr. 1, 1999), at 118, 122–23 (reporting on officer intuition in deciding who to stop and describing one officer as being of the "belie[f] he can spot drug traffickers from the general cut of their jib").

[39] Kreit, *supra* note 33, at 751.

[40] *See, e.g.*, Peter Verniero & Paul H. Zoubek, INTERIM REPORT OF THE STATE POLICE REVIEW TEAM REGARDING ALLEGATIONS OF RACIAL PROFILING 26–28, 67–68 (1999), https://www.state.nj.us/lps/intm_419.pdf [https://perma.cc/5T8Y-25PG] (finding nonwhite drivers were treated differently than white drivers in terms of consent searches and hit rates of searches); David A. Harris, *Driving While Black: Racial Profiling on Our Nation's Highways*, ACLU (1999), https://www.aclu.org/report/driving-while-black-racial-profiling-our-nations-highways [https://perma.cc/HMK5-JUSK] (concluding that Latinos make up a disproportionate number of those stopped by police, particularly of those stopped by drug interdiction units); David Rudovsky, *Law Enforcement by Stereotypes and Serendipity: Racial Profiling and Stops and Searches Without Probable Cause*, 3 U. PA. J. CONST. L. 296, 299–306 (2001) (chronicling many of the then existing studies on racial profiling).

[41] *See* Harris, *supra* note 32, at 560–69.

subjected to a pretextual traffic stop.[42]  The study concluded that once stopped, Black and Latino drivers disproportionately were cited for minor infractions, such as equipment violations.[43]

Similarly, a study of four million traffic stops in California found that for "Black Californians the likelihood of being searched is more than twice that of white Californians—a search rate of 20.5% and 8.2%, respectively."[44]  A study of fourteen years of police traffic stops in North Carolina showed that Black drivers were 63% more likely to be stopped and 115% more likely to be searched than white drivers, even though they drive less and contraband is less likely to be found in searches of Black drivers.[45]  Concentrating pretextual stops within Black and brown neighborhoods causes severe harms, as community members who are stopped are at significant risk of economic, psychological, and physical harm.

To begin with, Black and Latino drivers routinely subjected to pretextual traffic stops face burdensome fines, fees, forfeitures, and arrests.[46]  Unpaid fines and fees in particular often result in a spiraling set of consequences—such as license revocations, additional debt through interest or late fees, arrest, or even jail.[47]

---

[42] Epp et al., *supra* note 11, at 110.

[43] *Id.*

[44] Magnus Lofstrom, et al., *Racial Disparities in Law Enforcement Stops*, PUB. POLICY INST. CAL. (Oct. 2021), https://www.ppic.org/?show-pdf=true&docraptor=true&url=https%3A%2F%2Fwww.ppic.org%2F publication%2Fracial-disparities-in-law-enforcement-stops%2F.

[45] Chris Horn, *Racial Disparities Revealed in Massive Traffic Stop Dataset*, UNIV. S.C. (June 12, 2020), https://www.sc.edu/uofsc/posts/2020/06/racial_disparities_traffic_stops.php#.Y96Cc3bMI2y.

[46] *Fines and Fees*, VERA, https://www.vera.org/ending-mass-incarceration/criminalization-racial-disparities/fines-and-fees (last visited Nov. 21, 2023).

[47] *Id.*

And for many Black and Latino drivers, stops are a real and justifiable source of fear, stress, and trauma.[48]  Recent traffic stops across the country demonstrate why: low-level traffic stops can quickly spiral into deadly uses of force by police.  The horrifying police killings of Tyre Nichols, Duante Wright, Sandra Bland, and Philando Castile, amongst many others, during police traffic stops are not anomalies—they are representative of a much larger national trend.  In 2021, a New York Times investigation found that, over a five-year period, 600 people in the United States were killed by police during traffic stops, 400 of whom had no weapon and were not being pursued for a violent crime.[49]  Again, "Black drivers were overrepresented among those killed."[50]

Just last year, the City of Chicago's Office of Inspector General found that *98%* of Chicago police officers' reported use of force during traffic stops involved force against a Black (87%) or Latino (11%) person.[51]  A report issued this spring by Chicago-based BPI (now known as Impact for Equity) and the Free 2 Move Coalition found that traffic stops by the Chicago police resulted in the largest share of incidents of officers pointing firearms at civilians—more incidents than

---

[48] Amber Landers, David Rollock, Charity Rolfes, and Demietrice Moore, *Police Contacts and Stress among African American College Students*, AM. J. ORTHOPSYCHIATRY 81, no. 1 (2011), 72–81, https://psycnet.apa.org/doiLanding?doi=10.1111%2Fj.1939- 0025.2010.01073.x; Amanda Geller, Jeffrey Fagan, Tom Tyler, and Bruce G. Link, *Aggressive Policing and the Mental Health of Young Urban Men*, AM. J. PUB. HEALTH 104, no. 12 (2014), 2321–27, https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2014.302046; J.L. Hirschtick, S.M. Homan, G. Rauscher, et al., *Persistent and Aggressive Interactions with the Police: Potential Mental Health Implications*, EPIDEMIOLOGY AND PSYCHIATRIC SCIS. 29 (2020), e19, https://www.cambridge.org/core/journals/epidemiology-and-psychiatric-sciences/article/persistent-and-aggressive-interactions-with-the-police-potential-mental-health-implications/08A72C424643BA06BF558E579CC30312.

[49] David D. Kirkpatrick, et al., *Why Many Police Traffic Stops Turn Deadly*, N.Y. TIMES (Nov. 30, 2021), https://www.nytimes.com/2021/10/31/us/police-traffic-stops-killings.html?smid=nytcore-ios-share&referringSource=articleShare.

[50] *Id.*

[51] CITY OF CHI. INSPECTOR GEN., *supra* note 36.

those recorded in response to dispatch calls about a "person with a gun" or "shots fired," *combined*.[52]

### E. The Harms of Pretextual Traffic Stops and Vehicle Searches, Including Those Based on the Alleged Odor of Cannabis Alone, Greatly Outweigh Any Perceived Benefits

Beyond exacerbating racial disparities and inflicting physical, psychological and economic harm, pretextual traffic stops and subsequent searches, including those based on the alleged odor of cannabis, do not improve public safety. Academic research establishes that stops and searches that are not based on reliable evidence of serious criminal activity are unlikely to be efficient or productive.[53] This is borne out by the fact that the vast majority of pretextual traffic stops do not result in the recovery of contraband, such as drugs or firearms.

In Illinois in 2022, for example, police found contraband (defined as drugs, drug paraphernalia, alcohol, weapons, stolen property, or "other"), in only 1.5% of all traffic stops statewide.[54] Likewise, in Nashville, researchers found that pretextual traffic stops disproportionately targeting Black and Latino drivers rarely led to arrests or the recovery of drugs or contraband, and had no statistically significant relationship to crime in the short- or long-term.[55]

---

[52] *A New Vehicle for "Stop and Frisk": The Scope, Impact, and Inequities of Traffic Stops in Chicago*, BPI & FREE 2 MOVE 26 (Mar. 2023), https://www.impactforequity.org/wp-content/uploads/2023/05/BPI_Traffic-Stop-Report_F.pdf.

[53] John MacDonald, Jeffrey Fagan, & Amanda Geller, *The Effects of Local Police Surges on Crime and Arrests in New York City*, PLoS ONE (June 16, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2614058.

[54] *See* ILL. STATE POLICE, *supra* note 35, at 4.

[55] *An Assessment of Traffic Stops and Policing Strategies in Nashville*, POLICING PROJECT 10 (2018), https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5bf2d18d562fa747a554f6b0/154264

Similarly, in the District of Columbia, research found that only 1% of pedestrian and traffic stops *combined* led to the recovery of a gun in 2020.[56]

In short, pretextual traffic stops are deployed by police to recover contraband and reduce crime and yet, pretextual traffic stops are demonstrably ineffective at achieving that goal. They rely on the arbitrary and inaccurate characterization of Black and Latino drivers as criminals, which unfairly subjects them to at-will intrusions of their privacy and relegates them to second-class citizenry. Thus, this Court will not hinder public safety if it holds that officers in a jurisdiction where cannabis is legal may not use its odor as a pretext to fish for other evidence against a driver. Such a holding will, however, discourage officers from using pretextual traffic stops in ways that disproportionately single out Black and Latino drivers for harassment, fear, physical harm, and even death.

> ### F. Pretextual Stops and Searches Based on the Alleged Odor of Cannabis Alone are Insulated from Judicial Scrutiny, Preventing Review of Baseless Police Actions

Finally, holding that the odor of burnt cannabis alone does not constitute probable cause for a vehicle search in Illinois will promote officers' adherence to the Fourth Amendment.

Unlike most facts giving rise to probable cause or exigent circumstances, odors are intangible and dissipate soon after they are allegedly perceived. An odor will not appear on video or audio from officer-worn cameras (sometimes called body-worn cameras). As a result, it is difficult in practice for most people subjected to unfounded warrantless vehicle searches for

---

0014294/Policing+Project+Nashville+Report.pdf (finding that just 2% of stops resulted in arrest or recovery of contraband).

[56] *Racial Disparities in Stops by the D.C. Metropolitan Police Department: Review of Five Months of Data*, ACLU-DC AND ACLU ANALYTICS 8–9 (June 16, 2020), https://perma.cc/N4B8- AA86.

cannabis to mount an effective challenge to the legality of a search based on an officer's claim that an odor was present. The challenge sets up a credibility war between the officer and the motorist where the motorist is at a distinct disadvantage. Courts have long deemed officers' claims of smelling cannabis to be credible, and stopped all further inquiry, without determining whether the officer's opinion about detecting the odor is reliable (i.e., "reasonably trustworthy")[57] information, and supported by a factual basis rather than a bare assertion. The District Court in this case appears to have unquestioningly accepted the officer's written statement that he detected a lingering odor of cannabis on Mr. Erving or in his car, despite the fact that the officer made no mention of any such odor when searching Mr. Erving's car.

Worse, only drivers who are criminally charged as a result of the search will be able to bring a challenge via a suppression motion. Many will likely plead out before their motion is heard,[58] and therefore, will waive any right to challenge a search's legality.

If no contraband is recovered and no court case results, the overwhelming majority of people subjected to the type of warrantless searches at issue in this case have no practical means of seeking relief if they believe an officer fabricated an odor of cannabis as a false basis for a search. Without the ability to recover substantial damages, motorists will be unlikely to find counsel willing to represent them. If they do, they may face hurdles such as qualified immunity defenses. *Monell* claims would be equally challenging due to the difficulty in gathering evidence of a policy or practice.

---

[57] *See, e.g., Draper v. United States*, 358 U.S. 307, 333 (1959).

[58] *The Truth About Trials*, MARSHALL PROJECT, https://www.themarshallproject.org/2020/11/04/the-truth-about-trials (last visited Nov. 21, 2023) ("About 94 percent of felony convictions at the state level and about 97 percent at the federal level are the result of plea bargains.").

The most practical way for this Court and others to discourage discriminatory, baseless and harassing pretextual traffic stops premised on the alleged odor of cannabis is to hold that, due to the legalization of personal amounts of cannabis in Illinois, the odor of burnt cannabis alone does not provide probable cause to search a vehicle here.

<u>Conclusion</u>

For the foregoing reasons, *amici* respectfully submit that this Court should reverse the District Court's denial of Mr. Erving's motion to suppress and find that, in a jurisdiction that has legalized possession of personal amounts of cannabis, the odor of burnt cannabis alone is not a sufficient basis for probable cause to search a vehicle pursuant to the automobile exception to the warrant requirement. A ruling to the contrary would further incentivize police to engage in harmful pretextual stops, which do not meaningfully improve traffic safety or fight crime, and would allow for the harmful racial disparities endemic to traffic and cannabis enforcement to continue.

Dated: November 30, 2023

Respectfully submitted,

/s/ Alexandra K. Block

Jonathan M. Brayman (ARDC # 6302461)
BREEN & PUGH
ILLINOIS ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS
53 W. Jackson Blvd., Suite 1550
Chicago, IL 60604
(312) 360-1001
jbrayman@breenpughlaw.com

Clifford Berlow
NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS
353 N. Clark St.
Chicago, IL 60654
(312) 840-7366
cberlow@jenner.com

Alexandra K. Block (ARDC # 6285766)
*Counsel of Record*
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740 ext. 340
ablock@aclu-il.org

Julian Clark
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
CRIMINAL LAW REFORM PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
(929) 969-4365
jclark@aclu.org

*Counsel for Amici Curiae*

21

## <u>Certificate of Compliance with Word Limit,</u>
## <u>Typeface Requirements, and Type-Style Requirements</u>

The undersigned certifies that this *amicus* brief complies with the word limit of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,325 words as shown by Microsoft Word.

The undersigned certifies that *amicus* brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font that is 12 points in the body of the brief and 11 points in footnotes.

Dated: November 30, 2023                    /s/ Alexandra K. Block
                                            Alexandra K. Block

                                            *Counsel for Amici Curiae*

## **Certificate of Service**

I hereby certify that on November 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 30, 2023                    /s/ Alexandra K. Block
                                            Alexandra K. Block

                                            *Counsel for Amici Curiae*